UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

---

ELLA J. FAUSZ, individually,
and on behalf of a class of similarly situated persons,

        CASE NO.:  3:15-cv-00145-CRS

        Plaintiffs,

    vs.

NPAS, Inc.,

        Defendant.

---

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

<u>**INTRODUCTION**</u>

Plaintiff Ella J. Fausz was injured in a car accident and received treatment in the emergency room of a nearby hospital.  The hospital sent Plaintiff invoices for the charges incurred during her treatment.  Later the hospital transferred Plaintiff's account to Defendant NPAS, Inc. ("NPAS"), which served as an extended business office for the hospital.  NPAS mailed a statement to Plaintiff asking her to make payment directly to the hospital or to contact NPAS if she needed any assistance in resolving her account.  The statement contained a payment coupon for Plaintiff to make payment directly to the hospital.

Plaintiff filed this putative class action, alleging that NPAS violated the Fair Debt Collection Practices Act ("FDCPA") when it sent the statement, because the statement failed to include a validation notice, as required by 15 U.S.C. § 1692(g)(a).  Plaintiff also alleged that NPAS failed to disclose in the communication that it was a "debt collector," as required by 15 U.SC. § 1692e(11).

This matter comes before the Court on a Motion by NPAS for Summary Judgment. The resolution of the Motion turns on a single dispositive question: "When is medical debt deemed to be in default?" While the FDCPA generally applies to "debt collectors," any person who collects his or her own debt, or a debt that was not in "default" at the time the person obtained it, is excluded from the coverage of the statute. 15 U.S.C. § 1692a(6)(F)(iii).

Accordingly, the operative question before the Court focuses on whether NPAS communicated with Plaintiff and members of the putative class regarding accounts that were in "default." If the answer to that question is "*no*," then Plaintiff has no grounds to bring her lawsuit. As outlined in more detail below, an examination of the facts and the relevant case law leads to the inescapable conclusion that the answer to the question must be "*no.*"

Indeed, the undisputed facts of this case establish that NPAS operates solely as an extended business office service provider for hospitals and clinics. Such businesses play a vital role in helping medical providers manage health care costs. They are commonly referred to in the medical industry as "early-out" providers. They serve as an express agent for a clinic or hospital. They act solely on behalf of and at the direction of the clinic or hospital. Their primary function is to assist hospitals and clinics in collections on patient accounts that are not in default and which are not classified as bad debt. By outsourcing such follow-up communications to extended business office service providers, medical providers are able to streamline operations and help reduce costs.

As a fundamental component of its business model, NPAS does not seek to collect bad debt or accounts in default. Because NPAS does not operate as a bad-debt collector, it is not

required to advise patients whom it contacts that it is a debt collector, or advise them of the right to request validation of their debt.

As already noted, hospitals and clinics utilize early-out servicers in an effort to effectively manage health care costs and to streamline the oftentimes lengthy process it can take to secure payment on patient accounts. After a patient is treated at a hospital or clinic, it is not uncommon for weeks or months to pass before the medical provider receives full payment. The reasons for this are many. It often may take time to process medical insurance claims and to obtain payment from third-party insurers, such as worker's compensation or auto insurers. There frequently may be insurance coverage issues that need to be resolved, before payment can be processed. During this period, while the reimbursement process is ongoing, patient accounts are typically considered to be active and outstanding – and not in default.

In the interests of promoting good community relations, medical providers are loathed to hold patient accounts prematurely in default or rush to declare patient accounts to be bad debt. Instead, medical providers will work with patients to pursue paths to help them satisfy their medical bills from whatever sources are available. Understandably, this process can take time. Moreover, the process often must be handled on an individualized basis—because of each patient's unique circumstances. Hospitals and clinics also often help patients search for alternative sources of payment, such as through secondary insurance, or they assist them in qualifying for a charity or financial assistance program.

In the instant case, NPAS provided contractual services to Springfield Regional Medical Center (the "Hospital"), which is owned by Community Mercy Health Partners. Pursuant to an "Extended Business Office Services Agreement," NPAS provided off-site business office

3

support services to the Hospital.  After the Hospital would send out billing statements to a patient on its own, the Hospital would electronically transfer the patient account to NPAS to act as the Hospital's agent and extended business office for a limited period of time.  NPAS would then send additional billing statements to the patient in the name of the Hospital.  In doing so, NPAS also would assist the Hospital's patients with questions about their accounts and help patients in locating and contacting insurers and receiving financial assistance.

Any payments made by a patient were remitted directly to the Hospital.  If payment or reimbursement were not eventually forthcoming, the Hospital would recall the patient account from NPAS.  The Hospital then might choose to classify the account as uncollectible or "bad debt" and place the account with a debt collector regulated by the FDCPA – a business entity other than NPAS.

The "Extended Business Office Services Agreement" expressly provided that the Hospital was contractually obligated not to send to NPAS any patient accounts which the Hospital deemed to be in default.  Indeed, the entire business model of NPAS is based on assisting hospitals with the voluntary payment or resolution of outstanding medical bills that are not in default status.  Accordingly, NPAS does not knowingly accept any patient accounts involving bad debt or that have been classified as being in default status.  Consistent with that approach, NPAS does no credit reporting on any patient accounts to the three national credit reporting agencies.

In order for Plaintiff to prevail in this action, she must convince the Court that the patient accounts of the putative class members which NPAS serviced on behalf of the Hospital were in

4

default when the Hospital transferred the accounts to NPAS.  If Plaintiff cannot make that showing, her claims fail, because NPAS would not fall within the purview of the FDCPA.

The undisputed facts in this case show that the patient accounts of the putative class members that were serviced by NPAS were not in default when the Hospital forwarded them to NPAS for servicing.  Accordingly, as a matter of law, Plaintiff has no viable cause of action.  Therefore, NPAS respectfully asks the Court to dismiss Plaintiff's claims.

## PLAINTIFF'S PUTATIVE CLASS CLAIMS AND THE PUBLIC POLICY IMPLICATIONS

Plaintiff seeks certification of a class comprised of any patients who were treated at the Hospital for the time period of September 11, 2014, through September 10, 2015, and who received letters on behalf of the Hospital from NPAS.  (Complaint, ¶¶ 27-28.)  In her Complaint, Plaintiff alleges that NPAS is a "debt collector" subject to the requirements of the FDCPA.  (*Id.* at ¶ 8.)  She further contends that NPAS was required to state in its communications with the Hospital's patients that the communications were from a debt collector and that the patients had the right to seek validation of their debts.  (*Id.* at ¶¶ 20 and 24.)

It would be safe to assume that if the Court were to grant the relief Plaintiff requests, the decision could have significant impact on the "early out" business model that is commonly used in the medical industry.  Plaintiff is essentially asking the Court to stake out a bright line rule and hold that any "early out" entity providing hospitals and clinics with extended business office services – like NPAS – must be fully-FDCPA compliant.

In order to convince the Court of the merits of her claims, Plaintiff is forced to argue that any patient account not immediately paid in full after receipt of treatment must be considered in default – regardless of how the hospital or clinic might actually consider the status of the

5

account.  Plaintiff's position, however, does not comport with the decisions of courts that have addressed this issue, nor does it square with the actual practices of hospitals and clinics. Moreover, Plaintiff advocates a position that will not serve the best interests of the putative class members.

In sum, Plaintiff wishes to strip away from hospitals and clinics the right to offer patients a measure of dignity and an ample opportunity to locate insurance coverage, to set up a payment plan, or to apply for financial assistance, before their accounts are deemed to be in default. Hospitals prefer not to needlessly traumatize patients by prematurely suggesting that their accounts are in default status.  Depending on the medical treatment that a patient has received, the patient may already be coping with trauma.  Yet, this aggressive approach is exactly what Plaintiff is advocating that the Court should mandatorily impose on hospitals and clinics.

This outcome, of course, would serve no useful public benefit.  To the contrary, it would create unwanted burden for hospitals and clients, add to the costs of health care, and generate needless patient anxiety.  NPAS therefore respectfully asks the Court to reject Plaintiff's untenable position and dismiss her claims.

## FACTUAL BACKGROUND

On August 16, 2011, Plaintiff was riding as a passenger in a vehicle stopped for a red light when "somebody plowed into the back end" of the car, causing Plaintiff to suffer neck and spine injuries.  (*See* pp. 14:2-15:11 and 17:17-20 of Transcript of Deposition of Ella Jane Fausz ("Fausz Dep.") attached as Exhibit A to the Affidavit of John P. Boyle ("Boyle Aff.").   Plaintiff was transported by ambulance from the accident scene to the Hospital, located in Springfield, Ohio, where she received medical care.  (*Id* at 12:14-23 and 16:14-24.)  After being discharged,

6

Plaintiff continued to receive treatment for her injuries.  In fact, she testified that she was still under continuing medical care at the time of her deposition earlier this year.  (*Id*. at 16:14-19.)

**A.     The Hospital's Approach to Handling Patient Accounts.**

The Hospital is a registered trade name for Community Mercy Health Partners ("Mercy Health"), a non-profit corporation and member of Catholic Health Partners, the largest non-profit health system in Ohio.  (*See* Boyle Aff. Exs. B and C, displaying copies of Mercy webpages titled "About Us" and "Mission & Values," located at "http://www.community-mercy.org/about.asp") (last visited Oct. 14, 2016.)   As a "ministry," Mercy Health's mission is to provide community health services, particularly to the poor and underserved.  (*See* Boyle Aff., Ex. C; *see also* p. 10:7-18 of Transcript Deposition of Michelle Napier ("Napier Dep.") attached to Boyle Aff. as Ex. D.)

Mercy Health does not use the term "default" to describe overdue patient accounts, and it does not consider accounts that are not promptly paid to be in default.  (Napier Dep. at 17:16-23; *see also* pp. 65:15-19, 67:6-10, 69:19-70:2, and 72:1-5 of Transcript of Deposition of David Gaffey ("Gaffey Dep.") attached to Boyle Aff. as Exhibit E.)  Likewise, the Hospital does not use the terms "past due" or "delinquent" to describe the status of its patient accounts.  (Napier Dep. at 17:19-23.)  The Hospital's patient accounts will "age," but the Hospital does not label them as being in "default."  (*Id*.)

As its patient accounts age, the Hospital works to resolve unpaid accounts through insurance, Medicare, Medicaid, financial assistance programs, and charity care, among other things.  (*Id*. at 10:7-18.)  Only when the patient seems unwilling to cooperate and the account is long overdue, does the Hospital consider the account to represent uncollectible "bad debt" and

thereafter transfer the account to a third-party debt collection agency.  (*Id*. at 40:14-41:16 and 45:7-46:3).

**B.    The Extended Business Office Service Agreement Between the Hospital and NPAS Prohibited the Hospital from Sending Accounts in Default to NPAS.**

On or about August 1, 2010, Mercy Health and the parent company of NPAS, National Patient Account Services, Inc., entered into an "Extended Business Office Services Agreement" (the "Agreement"), which was assigned to NPAS on February 1, 2011. (Boyle Aff. Ex. F.)

The Agreement provides, in relevant part, as follows:

1.2    <u>Power of Attorney</u>.  For the term hereof, Customer hereby appoints NPAS to be Customer's true and lawful attorney-in-fact, for the following purposes:  (i) to bill patients and third party payors in Customer's name and on Customer's behalf; (ii) to collect accounts receivable resulting from such billing in Customer's name and on Customer's behalf; and (iii) to collect any accounts and monies owed to Customer, and to contest adjustments and denials by third-party payors.  In acting pursuant to this limited power of attorney, NPAS shall, at all times, be subject to Customer's instructions regarding the disposition of Customer's collections and shall only act on behalf of Customer with respect to such collections [].

2.1    <u>Services</u>.  Subject to the provisions of this Agreement, NPAS shall, directly or through its Affiliates, provide the Services to Customer with respect to the Facility. NPAS shall perform the Services in material compliance with this Agreement, the NPAS Policies, and in material compliance with applicable law.  The services provided by NPAS pursuant to this Agreement are as *an extended business office and not a delinquent debt collector*.  Because NPAS is providing services on *current* patient accounts, which *are not in default, NPAS is not a delinquent debt collector and has not sought any licenses as such*.  NPAS has relied upon Customer's representations that its accounts are *not in default* at the time they are transmitted to it, and *cannot render services to Customer on defaulted accounts*.

2.2    <u>Defaulted Accounts</u>.  *Customer represents that the accounts it provides to NPAS are not (and will not be in) default at the time they are transmitted to NPAS*.  The Client will not assign any account to NPAS if the facility knows that there is no legal right to collection on such account, *nor assign to NPAS any account, which is considered in default*.

(Boyle Aff., Ex. F) (emphasis added).  This Agreement governed the relationship between NPAS and the Hospital.

8

As a matter of standard practice and procedure, if the Hospital did not receive a response to invoices sent directly by the Hospital to the patient, or the patient failed to return a financial aid application that the Hospital had transmitted to the patient, the account would "go to [a] business partner" – typically an "early-out vendor" such as NPAS.  (Gaffey Dep. at 25:5-20.) The early-out vendor would send to the patient on the Hospital's behalf "additional information and make some proactive communications" with the patient in order to try "to resolve their open balances."  (*Id*.)

When asked to describe what an "early-out service" was, a Hospital representative testified:  "It's an extension of our business office to work with patients to resolve their open balances.  A vendor partner that's an extension of our business office."  (*Id*. at 27:24-28:4.)  The Hospital representative went on to explain that only after the early-out vendors are unsuccessful in collecting a patient balance would the account go to a "bad debt agency."  (*Id*. at 35:19-36:4.)

The same Hospital representative further testified:  "As a mission-based organization, we make every effort to make sure the patient has financial aid options.  We proactively . . . reach out to them . . . we exhaust a lot of effort to make sure they have the ability to resolve those accounts."  (*Id*. at 69:3-9.)  Another Hospital representative likewise testified:  "[W]e will send an account to NPAS, but NPAS is not a debt collector."  (Napier Dep. at 70:19-71:16.)

The fundamental business model employed by NPAS is that it only serves as an extended business office for the hospitals and clinics it assists.  (*See*  ¶ 3 of Affidavit of Lisa Summers ("Summers Aff."))  NPAS neither collects bad debt nor handles any patient accounts classified by a hospital or clinic to be in default.  (*Id*. at ¶ 4.)  NPAS does not do credit reporting.  (*Id*. at ¶ 5.)  It acts solely at the direction of the hospital or clinic and in the name of a hospital or clinic.

(*Id*. at ¶ 6.)  It has no authority beyond that expressly given to it by the hospital or clinic.  (*Id*. at ¶ 7.)

In the case of the Hospital, NPAS entered into a written agreement with the Hospital which provided that the Hospital would never transfer to NPAS any accounts it deemed to be in default. (Boyle Aff. Ex. F, ¶¶ 2.1 and 2.2.)  Indeed, the contract could not have been clearer on that subject.  The agreement expressly stated that the services being provided to the Hospital by NPAS were "as an extended business office and not a delinquent debt collector."  (*Id*. at ¶ 2.1.)  The Hospital "represent[ed] that the accounts it provides to NPAS are not (and will not be) in default at the time they are transmitted to NPAS[,]" and it agreed that it would "not assign to NPAS any account, which is considered in default."  (*Id*. at ¶ 2.2.)  The contract also stated that NPAS was relying upon the Hospital's "representations that its accounts are not in default at the time they are transmitted to [NPAS]."  (*Id*. at ¶¶ 2.1.)  Moreover, the agreement unequivocally stated that NPAS "cannot render services to [the Hospital] on defaulted accounts."  (*Id*.)

### C.    Plaintiff's Account.

Mercy Health transmitted Plaintiff's account to NPAS on January 27, 2014.  (Doc. 48-1, p. 15) (Answer to Interrogatory No. 5 of Second Supplemental Responses to Plaintiff's First Set of Interrogatories and Requests for Production by Defendant NPAS, Inc.)   Thereafter, NPAS sent a statement to Plaintiff, dated February 11, 2014.  (Boyle Aff., Ex. G.)  This statement was the only communication from NPAS that the Plaintiff identified in her Complaint.  (Complaint, ¶¶ 11-15.)  During her deposition, Plaintiff claimed that her entire lawsuit was based on this *one* written communication.  (Fausz. Dep. at 8:21-9:2 and 27:17-20.)

10

The statement that Plaintiff received from NPAS clearly identified the Hospital at the top of the document.  (Boyle Aff. Ex. G.)  The statement also contained an opening greeting, which stated:  "Recognizing you have a choice in selecting your health care provider, thank you for choosing Springfield Regional Medical Center."  (*Id*.)  At the bottom of the statement, there was a detachable coupon which directed that any payments be made directly to the Hospital.  (*Id*.)  The statement also provided that payment may be made "via the provider's website" at "www.community-mercy.org."  (*Id*.)  Moreover, the statement indicated that "[i]f you are unable to pay the total balance at this time, please contact us at the toll-free number shown above."  (*Id*.)  The telephone numbers listed were for NPAS.  (*Id*.)

On the back of the statement, additional information was provided.  In the first bullet point under the section entitled "About Your Account," the document stated:  "As part of our ongoing effort *to control the costs of health care*, your account is being managed *by a centralized patient accounting business office located outside of our medical center*.  If you have questions regarding your account, please call *us* at the toll free number on the front of this letter."  (*Id*.) (emphasis added.)

As already noted, NPAS does not do credit reporting on any patient accounts for any of the medical providers it serves.  (Summers Aff. ¶ 5.)  Consequently, NPAS did not furnish any information concerning Plaintiff's account with the Hospital to any credit reporting agency.  (*Id*. at ¶ 8.)  As it turned out, NPAS serviced Plaintiff's account on behalf of the Hospital only for about six weeks.  The Hospital recalled the account, and NPAS closed its file on the account on March 5, 2014.  (Doc. 48-1, p. 15) (Answer to Interrogatory No. 5.)

11

**D.      The Complaint.**

On February 11, 2015, Plaintiff filed this putative class action.  Plaintiff defined the putative class as:  "All individuals who received letters from NPAS sent on or after February 11, 2014, seeking payment of past due medical debt on behalf of Springfield Regional Medical Center." (Complaint at ¶ 28.)  Plaintiff further stated that she was pursuing claims for all members of the class "who received letters from NPAS seeking to collect medical debt within one year [sic] from the filing of this action." (*Id.* at ¶ 27.)

**E.      Deposition Testimony of Plaintiff.**

Plaintiff, in her sworn deposition testimony, stated that she "assumed" the statement she received from NPAS was from a debt collector, but she possessed no independent knowledge as to whether NPAS actually was a debt collector or not.  (Fausz Dep. at 10:24-11:21 and 12:24 – 13:22).  She testified that she simply "assumed" her account with the Hospital was in default, because she had not paid immediately, but she admitted that she had no independent knowledge regarding whether the Hospital actually assigned defaulted debt to NPAS.  (*Id.* at 12:10-13 and 98:5-14.)

Plaintiff further testified to holding the personal belief that when an account is in default, the debt gets put on the patient's credit report.  (*Id.* at 20:25-21:20.)  Plaintiff admitted, however, that she has not produced (and, in fact, cannot produce) any evidence that NPAS ever furnished any information concerning her account with the Hospital to any credit reporting agency.  (*Id.*)  In fact, she testified that she pulled her credit report, and she did not see any reference to the Hospital's bill.  (*Id.*)

Regarding her motivation in bringing her lawsuit, Plaintiff testified that based on her "assumption" that NPAS was a debt collector, she believed NPAS was obligated to identify itself as a debt collector and give her notice of how to contest the debt.  (*Id*. at 12:24-13:22.) Consistent with this, Plaintiff acknowledged that the whole focus of the lawsuit centered on whether at the time she received the statement from NPAS, it was acting as a debt collector.  (*Id*. at 34:11-14.)  She conceded during her deposition that she has suffered no actual damages.  (*Id*. at 32:13-33:8.)  Moreover, she admitted that she seeks no monetary recovery for herself.  (*Id*. at 33:2-8.)

Plaintiff further testified that when she received the statement from NPAS, she "assumed" that the communication was a medical bill from the Hospital.  (*Id*. at 56:22-57:12.) She also readily acknowledged that the statement NPAS sent her contained a coupon that she could have used to make payment directly to the Hospital. (*Id*. at 59:9-22.)

## LEGAL ARGUMENT

### I.    Summary Judgment Standard.

NPAS asks the Court to grant summary judgment in its favor and to dismiss Plaintiff's complaint, along with the putative class claims, pursuant to Federal Rule of Civil Procedure 56(a).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The initial burden lies with the moving party to demonstrate that no such dispute exists and that it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its

13

favor." *Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).  "Even so, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Snyder v. Lady Slings the Booze, LLC*, 73 F.Supp.3d 871, 873 (W.D. Ky. 2014) (Simpson, J.) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).

Indeed, only a showing of a "*genuine*" issue of "*material*" fact is sufficient to overcome an "otherwise properly supported motion for summary judgment…."  *Tysinger*, 463 F.3d at 572 (emphasis in original and citing *Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2005)).  For a dispute to be "genuine," it must be "based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Tysinger* at 572 (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004).  The materiality of a fact issue is determined by the substantive law.  *See USSEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see also Tyinger*, 463 F.3d at 572 ("A factual dispute concerns a 'material' fact only if its resolution might affect the outcome of the suit under the governing substantive law.").

## II. Plaintiff Has Not Suffered a "Concrete" Injury-in-Fact and Lacks Article III Standing to Prosecute This Action.

Plaintiff has alleged a "bare procedural violation" of the FDCPA, "divorced from any concrete harm."  *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016).  Her complaint therefore fails to satisfy the "injury-in-fact" predicate of Article III standing, and must be dismissed.

### A. The "Irreducible Constitutional Minimum of Standing."

Article III of the United States Constitution "confines federal courts to adjudicating actual 'cases' and 'controversies.'"  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  The standing

14

doctrine is but one of the "doctrines that cluster about Article III," but "is perhaps the most important" of them.  *Id*.  (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178-79 (D.C. Cir. 1983)).  Justice Scalia explained that "[t]hough some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen*, 468 U.S. at 751).  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The Supreme Court articulated the "irreducible constitutional minimum of standing," which consists of three elements: (1) the plaintiff must have suffered an injury-in-fact (i.e., one that is "concrete and particularized" or "actual and imminent, not conjectural or hypothetical)"; (2) which injury is "fairly traceable to the challenged action of the defendant;" and (3) is capable of redress by "a favorable decision" from the court.  *Lujan*, 504 U.S. at 560-61 (internal quotation marks and citations omitted).

The Supreme Court recently revisited the "injury-in-fact" predicate in *Spokeo v. Robins*, 136 S. Ct. 1540 (2016), and specifically the "concrete" nature of an injury required to establish Article III standing.  Justice Alito, writing for the majority, made clear that "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist.  When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'"  *Id*. at 1548 (quoting for the definition of "concrete" cited in Black's Law Dictionary 479 (9th ed. 2009); Webster's Third New International Dictionary 472 (1971); and Random House Dictionary of the English Language 305 (1967)).  The *Spokeo* Court further explained that "'[c]oncrete' is

not…necessarily synonymous with 'tangible.'" *Id*. at 1549.  Indeed, "Congress may 'elevat[e] to

the status of legally cognizable injuries concrete, *de facto* injuries that were previously

inadequate in law.'" *Id*. (citing *Lujan*, 504 U.S. at 578).  Intangible, but nonetheless "concrete,"

injuries-in-fact can even arise from "the real risk of harm…."  *Id*.  (citing *Clapper v. Amnesty

Int'l USA*, 133 S. Ct. 1138 (2013)).

A plaintiff, however, cannot "allege a bare procedural violation, divorced from any

concrete harm, and satisfy the injury-in-fact requirement of Article III."  *Id*.  (citing *Summers v.

Earth Island Institute*, 555 U.S. 448, 496 (2009)).  In the context of consumer litigation under

statutes such as the Fair Credit Reporting Act ("FCRA"), a plaintiff "cannot satisfy the demands

of Article III by alleging a bare procedural violation," because "[a] violation of one of the

FCRA's procedural requirements may result in no harm."  *Id*. at 1550.

**B.     Plaintiff Has Not Pled a Concrete Injury-in-Fact Sufficient to Confer Article III Standing.**

Plaintiff has asserted a bare procedural violation of the FDCPA.  She alleges that NPAS

violated the Act by failing to identify itself as a debt collector in the statement NPAS mailed to

her on behalf of the Hospital.  (Complaint at ¶¶ 20-21.)  Plaintiff further alleges that NPAS

violated the FDCPA by failing to provide her with a so-called "validation notice" in the

statement.  (*Id*. at ¶¶ 24-26.)  It is clear from the face of Plaintiff's Complaint, however, that these

asserted violations are completely divorced from any concrete harm.

Plaintiff set out the following averments in her complaint concerning harm:

17.     As a proximate consequence of Defendant's conduct herein alleged, Ms. Fausz is entitled to an award against Defendant in the form of actual damages, statutory damages,  attorney's fees, and costs.

16

25.     By reason of the conduct complained of herein, Defendant violated the FDCPA and is liable to Plaintiff for actual damages and statutory damages up to one-thousand dollars ($1,000) per 15 U.S.C. § 1692k *et seq*.

26.     With respect to the additional damages that may be awarded pursuant to 15 U.S.C. § 1692k(a)(2)(A), Defendant's noncompliance with the FDCPA is intentional, frequent, widespread and affects a large number of persons perhaps numbering into the thousands, including but not limited to Plaintiff.

(*Id*. at ¶¶ 17, 25, 26.)

Plaintiff admitted in her sworn deposition testimony that she suffered no actual damages in this case. (Fausz Dep. 32:13-33:8.) Plaintiff also testified that she seeks no monetary recovery of any kind for herself. (*Id*. at 33:2-8.) Both Plaintiff's Complaint and her sworn testimony reflect that she experienced no harm. Her claims therefore fall short of the Article III requirement that she must have suffered a "concrete" injury-in-fact. Accordingly, her complaint should be dismissed. *Spokeo*, 136 S. Ct. at 1549.

### C.     Plaintiff Has Not Suffered an "Informational Injury" Sufficient for Standing.

Plaintiff may oppose dismissal of her claims on standing grounds by asserting that she has suffered an "informational injury" sufficient to confer standing. To the extent the *Spokeo* court "implicitly recognized" that such an injury may be sufficiently "concrete" for standing purposes, it limited that recognition to cases involving interests of broad public application and importance, such as racial discrimination and voters' rights. *Larson v. Trans Union, LLC*, No. 12-cv-05726-WHO, 2016 WL 4367253, at *3 (N.D. Cal. Aug. 11, 2016) (citing *Spokeo* at 1549-50); *Nokchan v. Lyft, Inc.*, No, 15-cv-03008-JCS, 2016 WL 5815287, at *6 (N.D. Cal. Oct. 5, 2016). This Court should reject any argument that this case implicates such a broad level of

17

public applicability or importance.  Two recent district court cases provide persuasive support for dismissal of Plaintiff's complaint on these grounds.

The Northern District of California recently held that a plaintiff who sued under the FCRA alleging, in part, that the defendant did not provide him with certain disclosures required by the Act, failed to establish a "concrete" injury-in-fact, and the Court dismissed his complaint. *Nokchan*, 2016 WL 5815287, at *9.  In *Nokchan*, the Plaintiff argued, among other things, that he satisfied the injury-in-fact requirement, because he experienced an informational injury when the defendant failed to give him the statutorily-required disclosures.  *Id*. at *8.

The Court noted that in *Spokeo* the Supreme Court held that "a violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact.  In other words, a plaintiff in such a case need not allege any additional harm beyond the one Congress identified."  *Id*. at *6 (citing *Spokeo* at 1549-50).  The *Nokchan* court also recognized that "[t]he case law is not consistent with respect to how broadly to read the language in *Spokeo* with respect to informational injury." *Id*. at *6 (citing *Church v. Accretive Health, Inc.*, No. 15-15708, 2016 WL 3611543, at *1 (11th Cir. July 6, 2016)).  Analyzing recent case law stemming from Justice Thomas' concurrence in *Spokeo*, the *Nokchan* court distinguished those cases in which "[a] plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of that private right" to satisfy the injury-in-fact requirement from lawsuits filed under consumer protection statutes, such as the FDCPA, FCRA, and the Real Estate Settlement Procedures Act.  *Id*. at *7 (citing *Spokeo* at 1553 (Thomas, J., concurring)).

The case that Justice Thomas primarily relied upon for the proposition that an informational injury may be sufficient for Article III standing to sue under the Fair Housing Act

18

("FHA"), absent any additional harm, involved false information supplied to black "tester" buyers regarding the availability of housing based on their race. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). Similarly, the cases cited by the *Spokeo* majority on this point involved voters' inability to obtain campaign finance information, pursuant to the Federal Election Campaign Act of 1971, and advocacy organizations' failure to obtain information subject to disclosure under the Federal Advisory Committee Act. *Spokeo* at 1549-50 (citing *FEC v. Akins*, 524 U.S. 11 (1998); *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989)).

Though some courts have drawn comparisons between the right to information created under the FHA and the disclosures mandated by the FDCPA, the *Nokchan* court clearly rejected such a reading of *Spokeo*, describing those courts' reasoning as "inconsistent with *Spokeo* to the extent that the cases in *Spokeo*…implicated interests of broad significance to the public, whereas the alleged failure to disclose [under the FDCPA] did not." *Nokchan*, 2016 WL 5815287 at *9. As to the plaintiff's claims under the FCRA, the *Nokchan* court held that "violation of a disclosure requirement under the FCRA, by itself," is insufficient to demonstrate a "concrete" injury-in-fact. *Id*.

> The Eastern District of New York also recently explained that:
>
> The statutes at issue in both *Akins* and *Public Citizen* were drafted to effectuate broad disclosure of information to the public…Significantly, both *Akins* and *Public Citizen* involved statutory rights intended to protect and promote public interests that, by their nature, are intangible and diffuse, and would be rendered wholly unenforceable were intangible injury, or bare procedural violations, categorically insufficient to confer standing.
> …
> [A]s previously discussed, the Court reads *Spokeo* as affirming the principle that a claim of a bare procedural statutory violation will be insufficient to confer standing, except in situations where Congress clearly intended to create a right to bring suit regardless of the existence or non-existence of actual harm, such as the

Supreme Court found with respect to the statutes at issue in *Public Citizen* and *Akins*.

*Dolan v. Select Portfolio Servicing*, No. 03-CV-3285 PKC AKT, 2016 WL 4099109, at *4, *7 (E.D.N.Y. Aug. 2, 2016).

Section 1692g and § 1692e(11) were designed to provide consumers with certain information during the "bad debt" collection process, including the fact that they are dealing with a debt collector and that they have the ability to request certain information to determine the validity of the debt. These provisions do not protect a public interest that is on the same level with the prevention of racial discrimination or the protection of voting rights. Indeed, the provisions of the FDCPA are designed to protect only a relatively-narrow subset of the population—consumer debtors.

Here, Plaintiff does not allege that she was in any way misled by the letter that NPAS sent to her on behalf of the Hospital. Moreover, Plaintiff does not dispute that she received medical treatment from the Hospital or that in doing so, she incurred charges. (Fausz Dep. at 14:2-14.) If Plaintiff had alleged that she was misled in some material way by NPAS, or alleged that she did not owe the Hospital for her medical care, she might have articulated a sufficient informational injury-in-fact to confer standing. Because Plaintiff did not make such allegations, and because § 1692g and § 1692e(11) (requiring third-party debt collectors to provide "mini-miranda" warnings and "validation notices") do not implicate the type of broad public interests for which a bare procedural violation would constitute a "concrete" injury-in-fact, Plaintiff lacks Article III standing. Accordingly, her complaint should be dismissed.

**III.**   **NPAS Is Entitled to Summary Judgment Because It Is an Early-Out Servicer and Plaintiff's Account Was Not "In Default" When It Was Placed With NPAS for Servicing.**

Apart from Plaintiff's lack of Article III standing, her claims also fail on the merits.  The critical, dispositive issue in this case concerns whether NPAS is a "debt collector" subject to the FDCPA.  The FDCPA is limited in scope to the activities of "debt collectors."  *See Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 104 (6th Cir. 1996).  For purposes of the Act, a debt collector is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  However, "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity…concerns a debt which was not in default at the time it was obtained by such person," is specifically excluded from the statutory definition of "debt collector."  *Id*. at subdiv. (F)(iii); *see also Carter v. AMC, LLC*, 645 F.3d 840, 843 (7th Cir. 2011).

In this case, the Hospital placed Plaintiff's account with NPAS for early-out servicing on January 27, 2014.  (Doc. 48-1, p. 15) (Answer to Interrogatory No. 5.)  Therefore, the operative question focuses on whether Plaintiff's account was "in default" on that date.  *See Church v. Accretive Health, Inc.*, No. 14-CV-0057-WS-B, 2015 WL 7572338, at *9 (S.D. Ala. Nov. 24, 2015) aff'd at ___Fed.App'x___, 2016 WL 3611543, at *1 (11th Cir. July 6, 2016).  The facts and the pertinent authority establish, as a matter of law, that the answer to this question is "no."  Because NPAS was not a third-party debt collector, subject to the FDPCA, it was not required to identify itself as a debt collector or to provide a validation notice.

A.   **The Determination of Whether a Patient Account Is In Default Status Is Based on the Hospital's Treatment of the Account, as Well as How NPAS Treated the Account.**

Though the FDCPA provides an exception from its coverage for accounts that are not actually in default, it does not define the term "default."  *See* 15 U.S.C. § 1692a; *Alibrandi v. Financial Outsourcing Services, Inc.*, 333 F.3d 82, 86 (2d Cir. 2003).  Nonetheless, the case law and regulatory authority provide some guideposts on this issue, which counsel in favor of a finding that Plaintiff's account was not "in default" when the Hospital placed it with NPAS.

In *Alibrandi v. Financial Outsourcing Services, Inc.*, the Second Circuit, surveying decisions nationwide, held that there is a difference "between a debt that is in default and debt that is merely outstanding," and noted that "only after some period of time does an outstanding debt go into default."  333 F.3d at 86-87 (citing *Skerry v. Mass. Higher Educ. Assistance Corp.*, 73 F.Supp.2d 47, 51 (D. Mass. 1999); *Jones v. Intuition, Inc.*, 12 F.Supp.2d 775, 779 (W.D. Tenn. 1998).  Accordingly, "the classification of debt collector depends upon the status of a debt, rather than the type of collection activities used."  *Id.* at 86.  The Fair Trade Commission similarly has expressed the view "that, in the absence of a contractual definition or conclusive state or federal law, a creditor's reasonable, written guidelines may be used to determine when an account is 'in default.'"  (DeMayo, Fed. Trade Comm'n, Informal Staff Op., 2002 WL 32809497, at *2 (May 23, 2002); *see also* Isgrigg, Fed. Trade Comm'n, Informal Staff Op. (Nov. 10, 2002).

The FTC's guidance is consistent with the most recent holdings on this issue, including the Eleventh Circuit's affirmance of the Southern District of Alabama in *Church v. Accretive Health, Inc*.  In *Church*, the District Court held that, "in the absence of a contractual definition or conclusive state or federal law, a creditor's reasonable, written guidelines may be used to

22

determine when an account is 'in default,' including such factors as 'whether the guidelines are applied consistently and whether they are designed for administering accounts, rather than for circumventing the FDCPA.'"  2015 WL 7572338, at *9 (quoting *Prince v. NCO Financial Services, Inc.*, 346 F.Supp.2d 744, 747 (E.D. Pa. 2004)).

The Eleventh Circuit affirmed the district court's "well-reasoned opinion," which held that "the debt at issue was not in default at the time Accretive Health obtained the debt, and thus, the FDCPA does not govern Accretive Health's letter to Church." ____Fed.App'x___ 2016 WL 3611543, at *4.  Other jurisdictions have applied the standard described by the FTC and employed by the Eleventh Circuit in *Church*.  *See e.g., Prince*, 346 F. Supp. 2d at 747; *Bohringer v. Bayview Loan Servicing, LLC*, 141 F. Supp. 3d 1229 (S.D. Fla. 2015).

As the District Court in *Church* succinctly stated:   "[i]t is [the] Hospital's understanding as to the status of [the patient's] account that matters" in determining whether the account was in default at any given point.  *Church*, No. 14-0057-WS-B, 2014 WL 7184340, at *7 n. 10 (S.D. Ala. Dec. 16, 2014) (Memo. Op. and Order granting in part and denying in part defendant's motion to dismiss or, alternatively, for summary judgment).  However, the Sixth Circuit has also made clear that "the definition of debt collector pursuant to § 1692a(6)(F)(iii) includes any non-originating debt holder that either acquired a debt in default *or has treated the debt as if it were in default* at the time of the acquisition." *Bridge v. Ocwen Federal Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012); *see also Shugart v. Ocwen Loan Servicing, LLC*, 747 F. Supp. 2d 938 (S.D. Ohio Sep. 28, 2010).  The defendant in the *Bridge* case was not an early-out servicer, like NPAS, but an assignee of the plaintiff's mortgage.  The defendant engaged in collection activity traditionally associated with a "debt collector," including credit reporting.  *Bridge*, 681 F.3d at

23

357 (defendant "made endless collection calls by phone to Mr. and Mrs. Bridge, despite cease

and desist requests…threatened foreclosure; assessed monthly late fees; and reported derogatory

information to the credit reporting agencies," and retained a law firm to collect the debt).

Regardless of this factual distinction, the *Bridge* holding does not support the argument that

NPAS is a debt collector, because, as discussed *infra*, NPAS at no point treated Plaintiff's

account as if it were in default.

> **B.   The Hospital Deemed Patient Accounts Uncollectible Only After the Hospital
> and Its Early-Out Vendors Had Exhausted Their Collection Efforts, and the
> Account Thereafter Constituted "Bad Debt" Eligible to Be Transferred to a
> Third-Party Collection Agency.**

The undisputed facts in this case show that the Hospital did not deem patient accounts

"bad debt" until after the Hospital and its early-out servicer, NPAS, had expended a great deal of

effort working with a patient and her insurer, or other third-party payors, to resolve the patient's

balance.  Only after those efforts were exhausted, and the patient was proving uncooperative,

would the Hospital recall the patient's account from NPAS and refer the account to an outside,

third-party collection agency.  The Hospital's practices and procedures in handling patient

accounts were reflected in the undisputed testimony of the Hospital's representatives -- precisely

the place where the Court should focus its inquiry.  *See Church*, 2015 WL 7572338 at * 11;

Gould v. ClaimAssist, 876 F.Supp.2d 1018, 1022-23 (S.D. Ill. 2012) (relying on the hospital's

testimony in making determination that the defendant—contracted by the hospital to process

third-party payor claims—was not a debt collector and that the patient's debt was not in default at

the time of placement).

As a threshold matter, the Hospital's outstanding patient accounts "age," but the Hospital

does not at any time use the term "default" in describing the status of a patient account.  (Napier

24

Dep. at 10:7-18 and 17:16-23; Gaffey Dep. at 72:1-5).  Rather, only after a patient demonstrates an unwillingness to cooperate in the voluntary resolution of her balance and the account is long overdue, will the Hospital deem the account to be "bad debt."  (Napier Dep. at 40:14-41:16 and 45:7-46:3.)

The Hospital's use of the phrase "bad debt," instead of "in default," is of no consequence to the Court's analysis, particularly in light of the fact that Plaintiff has not—and cannot— produce any evidence inconsistent with the proposition that the Hospital chose to use the phrase "bad debt," rather than "in default" to describe uncollectible debt.  *Church*, 2015 WL 7572338 at *11 ("Despite extensive discovery and exhaustive production and review of Providence's written policies and procedures, plaintiff has identified not a shred of evidence that is inconsistent with, or that tends to rebut or cast doubt on, Bragg's testimony that the hospital has always equated 'bad debt' with 'in default,' and has never deemed a patient account to be in default until designating it 'bad debt.'").

The Hospital's general procedure for processing patient accounts is quite simple and closely resembles the procedure followed by the hospital in *Church*.  First the Hospital will typically send invoices itself to a patient after rendering medical services. (Gaffey Dep. at 25:8-20.); *Church* at * 10.  If the patient does not respond to the invoices or submit a financial aid application, the Hospital will then place the patient's account with a "business partner," typically an "early-out vendor," like NPAS.  (*Id*.)

By "early-out vendor" or "early-out servicer," the Hospital means "an extension of our business office to work with patients to resolve their open balances.  A vendor partner that's an extension of our business office."  (Gaffey Dep. at 27:24-28:4.)  Thus, after the Hospital places a

patient's account with an entity, like NPAS, the early-out servicer performs the same tasks that the Hospital's business office would perform, *in the name of the Hospital*, and as a cost-saving measure for both the Hospital and its patients.  (Boyle Aff. Ex. F); (Summers Aff. ¶¶ 3-6, 8); *Church* at *10.  Indeed, when NPAS serviced Plaintiff's account for the Hospital, it made clear in its written communication that it was working in direct association with and in the name of the Hospital.  (Boyle Aff. Ex. G); *Church* at *10.

Accordingly, the Hospital did not consider NPAS a "debt collector."  (Napier Dep. at 70:19-71:16.); *see also Church* at *10 ("Operating as an 'extended business office' for Providence Hospital, and holding itself out as an extension of the hospital itself, Accretive Health already had every incentive to treat consumers with dignity and respect so as to preserve and foster those consumers' ongoing relationships with Providence.")

The Hospital's perception that NPAS did not act as a "debt collector" matched the reality of the situation.  NPAS does not collect bad debt or service patient accounts that any hospital or clinic it serves may have classified as "in default" or "bad debt."  (Summers Aff. ¶ 4.)  Nor does it report outstanding patient balances to any consumer reporting agencies—a quintessential facet of consumer debt collection practice.  *See e.g.*, *Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030, 1035 (D. Minn. 2010) (citing Cass, Fed. Trade Comm'n, Staff Op. Letter, 1997 WL 33791232, at *1 (Dec. 23, 1997)).  Like the Hospital, NPAS did not treat the Hospital's patient accounts as though they were in default when the Hospital placed the accounts with NPAS.  *Bridge*, 681 F.3d at 357, 366.

If the initial efforts of the Hospital and the subsequent efforts of NPAS, acting as the Hospital's agent, failed to resolve a patient's outstanding balance, the Hospital would recall the

account from NPAS.  At that point, the Hospital might deem the account uncollectible "bad debt" and transfer the patient account to a third-party collection agency.  (Napier Dep. at 40:14-41:16 and 45:7-46:3.)  It is at that point that the patient's account effectively became "in default."

### C.   Plaintiff's Account Was Not in Default when the Hospital Placed it with NPAS for Servicing.

Plaintiff obtained services from the Hospital on August 15, 2011.  (Fausz Dep. at 12:14-18 and 16:14-24.)  The Hospital placed Plaintiff's account with NPAS on January 27, 2014.  (Doc. 48-1, p. 15) (Answer to Interrogatory No. 5.)  The account was not in default at the time of the transfer, and Plaintiff has not—and cannot—make any showing to the contrary.  Nor did NPAS treat the account as though it were in default.

### 1.   The Hospital's undisputed testimony supports this finding.

As a matter of general procedure, the Hospital did not deem a patient account uncollectible "bad debt" until *after* NPAS had taken steps to help the consumer resolve the outstanding balance and the Hospital had recalled the account from NPAS.  At that point the Hospital might determine that all efforts to resolve the long overdue account had been exhausted, and it might place the patient account with a third-party collection agency.  (Napier Dep. at 40:14-41:16 and 45:7-46:3; Gaffey Dep. at 35:20-36:4.)  Accordingly, "[a]lthough the debt was *outstanding*, it cannot reasonably be viewed on these facts to have been *in default*" when NPAS was servicing the account.  *Church* at *10 (emphasis added); *see also Alibrandi*, 333 F.3d at 87 (holding that a debt is not "in default" immediately upon payment coming due.)

27

     **2.**     **The service agreement between the Hospital and NPAS supports this finding.**

The Extended Business Office Services Agreement between NPAS and the Hospital made very clear that "[t]he services provided by NPAS pursuant to this Agreement are as an extended business office and not a delinquent debt collector.  Because NPAS is providing services on current patient accounts, which are not in default, NPAS is not a delinquent debt collector…."  (Boyle Aff., Ex. F at ¶ 2.1.)  The Hospital specifically represented to NPAS in the Agreement that it did not consider its accounts to be "in default" at the time they were placed with NPAS.  (*Id*. at ¶ 2.2)  Indeed, the Hospital was contractually obligated *not* to place defaulted patient accounts with NPAS.  (*Id.*)  Moreover, the Agreement stated that NPAS did not and would not service any accounts that are in default.  (*Id*. at ¶ 2.1.)

As the District Court in *Church* aptly stated:

> There is nothing manipulative about a policy distinguishing account servicing work done by a vendor that acts as an extension of the hospital's business office (which . . . is not the sort of activity that the FDCPA was designed to regulate) from collection work done by a third-party commercial collection agency after the hospital has written off the account as bad debt (which is exactly the sort of activity that the FDCPA was designed to regulate).

*Church* at *13.

Consequently, the express language and requirements contained in the Extended Business Office Services Agreement supports a finding that Plaintiff's account was not in default when the Hospital placed it with NPAS.

     **3.**     **The undisputed testimony of NPAS supports this finding.**

NPAS did not treat Plaintiff's account as in default at the time the Hospital placed it for servicing, or at any time thereafter.  (Summers Aff. ¶¶ 3-9.)  It did not engage in activities traditionally associated with debt collectors attempting to collect defaulted debt, such as credit

28

reporting.  (*Id*. at ¶ 5.)  Consequently, the testimony of NPAS supports a finding that Plaintiff's account was not in default when the Hospital placed it with NPAS.  *Bridge v. Ocwen Federal Bank, FSB*, 681 F.3d 355 (6th Cir. 2012).

### 4.    Public policy supports this finding.

In enacting the FDCPA, Congress recognized that creditors are "generally restrained by the desire to protect their good will when collecting past due accounts," and thus are excluded from the Act's regulatory scope.  S. Rep. 95-382, at 2 (1977).  Debt collectors, on the other hand, typically have no prospect of "future contact with the consumer and often are unconcerned with the consumer's opinion of them."  *Id*.  Here, the "hand-in-hand relationship" between NPAS and the Hospital "renders [NPAS] much more akin to an originator (as to whom FDCPA restrictions do not apply) than a debt collector (as to whom they do)."  *Church* at *10.

NPAS acted *only* at the direction of the Hospital, which, "[a]s a mission-based organization…make[s] every effort to make sure the patient has financial aid options" and "exhaust[s] a lot of effort to make sure they have the ability to resolve those accounts." (Summers Aff. at ¶¶ 6-7; Gaffey Dep. at 69:3-9).  The Hospital is exceedingly conscientious about its perception within the community it serves and how community members are treated. *See* http://www.community-mercy.org/about.asp (last visited Oct. 14, 2016).  (Boyle Aff. Ex. B.) ("We are a mission-driven system focused on responding compassionately, efficiently and effectively to the comprehensive health and wellness needs of the communities we serve.")

It is evident from the statement NPAS sent to Plaintiff that it took the Hospital's reputation and patient relations very seriously.  (Boyle Aff. Ex. G) ("Recognizing that you have a

choice in selecting your health care provider, thank you for choosing Springfield Medical Center.")

On strikingly similar facts, the District Court in *Church* reasoned:

> Accretive Health was directly trading in the goodwill of Providence Hospital, portraying itself as an insider to the Providence-Church relationship, and holding itself out to Church as an extension of the hospital.  Looking at the purposes of the "in default" requirement for FDCPA disclosures, the undersigned is of the opinion that they would not be advanced by deeming Accretive Health to be subject to the FDCPA's restrictions here.  Operating as an "extended business office" for Providence Hospital, and holding itself out as an extension of the hospital itself, Accretive Health already had every incentive to treat consumers with dignity and respect so as to preserve and foster those consumers' ongoing relationships with Providence. There was no need for statutory compulsion to force Accretive Health to treat Church respectfully and fairly. Under the circumstances, Accretive Health was much more closely aligned with the status of a debt originator than that of a debt collector; therefore, the FDCPA's statutory purposes would not be promoted by regulating Accretive Health's conduct in the January 17 letter.

*Church* at *10.

Certainly, the same rationale applies to this case – especially where NPAS acted only as an extended business office for the Hospital.  For this reason, and those discussed *supra*, Plaintiff's debt was not in default when the Hospital placed it with NPAS for servicing, and Plaintiff's FDCPA claims against NPAS fail as a matter of law.

**IV.    Plaintiff's Claims Fail Because She Has Not Shown that the Alleged Misrepresentations Were Material.**

Even arguably, if Plaintiff had demonstrated a concrete injury-in-fact and established that NPAS was a debt collector subject to the FDCPA, her claims would nonetheless fail as a matter of law, because she has neither pled nor shown that NPAS made any misrepresentation that had a material impact on her decision-making ability.

30

The FDCPA precludes a debt collector from using any false, deceptive, or misleading representations in the course of attempting to collect a debt. 15 U.S.C. § 1692e.  To that end, the Act prohibits "[t]he failure to disclose in the initial written communication….that the debt collector is attempting to collect a debt and that any information will be used for that purpose," as well as "the failure to disclose in subsequent communications that the communication is from a debt collector." 15 U.S.C. § 1692e(11).

Whether a particular representation violates § 1692e is determined from the objective "least sophisticated consumer standard." *See Smith v. Transworld Systems, Inc.*, 953 F.2d 1025 (6th Cir. 1992); *Harvey v. Great Seneca Financial Corp.*, 453 F.3d 324, 329 (6th Cir. 2006). When applying the "least sophisticated consumer" standard to a debt collector's representations, the courts must also determine whether the representation was "material."  *Wallace v. Washington Mut. Bank.*, *FA*, 683 F.3d 323, 326-27 (6th Cir. 2012).  "The materiality standard simply means that in addition to being technically false, a statement would tend to mislead or confuse the reasonable unsophisticated consumer."  *Id.*

The Sixth Circuit has cited with approval the more nuanced conception of the materiality requirement articulated by Judge Easterbrook in the Seventh Circuit:

> Materiality is an ordinary element of any federal claim based on a false or misleading statement.
>
> We do not see any reason why materiality should not equally be required in an action based on § 1692e.  The statute is designed to provide information that helps consumers to choose intelligently, and by definition immaterial information neither contributes to that objective (if the statement is correct) nor undermines it (if the statement is incorrect).

*Hahn v. Triumph P'Ships*, 557 F.3d 755, 757-58 (7th Cir. 2009) (cited with approval in *Miller v. Jacitch, Block & Rathbone*, 561 F.3d 588, 596 (6th Cir. 2009)).

31

Materiality is an essential element of Plaintiff's claims.  However, beyond the conclusory averment that "NPAS' representations to Ms. Fausz in its…letter were materially false, deceptive, and/or misleading," Plaintiff has not set forth in any meaningful way *how* the omission of the "mini-miranda" or the "validation notice" from the statement affected her ability to choose intelligently her response or course of action.  (Complaint ¶ 19.)  Plaintiff simply "assumed" that NPAS was a debt collector.  (Fausz Dep. at 10:24-11:21.)  She also "assumed" that the statement was a medical bill from the Hospital.  (*Id.* at 56:22-57:12.)  Because of Plaintiff's failure to plead any facts or otherwise demonstrate that this omission had a material effect on her decision-making ability, her Complaint should be dismissed.

**V.     NPAS Has Reasonable Procedures and Contracts in Place to Ensure That Hospitals and Clinics Do Not Place With It Any Defaulted Debts, and Any Attempt NPAS Made to Collect a Defaulted Debt Mistakenly Sent to It by the Hospital Was Unintentional and Occurred Notwithstanding Those Reasonable Procedures.**

NPAS is an early-out servicer.  Fundamental to its business model is its commitment to service only active, non-defaulted accounts.  If a mistake was made, and somehow the Hospital transferred to it an account that was actually in default, then any subsequent actions undertaken by NPAS would have been in good faith and the result of a bona fide error ("BFE").  Any alleged acts or omissions arising out of the Hospital's mistake occurred notwithstanding reasonable procedures that NPAS had in place *and* despite the express language of its contract with the Hospital.

The FDCPA provides that "[a] debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error."  15 U.S.C. § 1692k(c).  To

32

prevail on a BFE defense, "[t]he debt collector must only show that the violation was unintentional, not that the communication itself was unintentional.  To hold otherwise would effectively negate the…defense." *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 402 (6th Cir. 1998).

Application of the BFE defense requires a three-part inquiry.  The "debt collector must prove by a preponderance of the evidence that:  (1) the violation was unintentional; (2) the violation was a result of a bona fide error; and (3) the debt collector maintained procedures reasonably adapted to avoid such error."  *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 538 F.3d 469, 476-77 (6th Cir. 2008) rev'd on other grounds at 559 U.S. 573 (2010).

"As to the first prong"—that the violation be unintentional—the BFE defense "requires only negation of specific intent." *Durthaler v. Accounts Receivable Management, Inc.*, 854 F.Supp.2d 485, 493 (S.D. Ohio 2012) (citing *Johnson v. Riddle*, 443 F.3d 723, 729 (10th Cir. 2006)).  Therefore, the focal point of this predicate focuses on the subjective intent of the debt collector. *Id.*  Here, the Court can infer from the record that NPAS subjectively treated Plaintiff's account as not in default, and took proactive steps to prevent defaulted accounts from being placed with it for servicing as a matter of consistent, general procedure.  (Boyle Aff. Ex. F); *Durthaler*, 854 F.Supp.2d at 494 (citing *Johnson*, 443 F.3d at 729) ("subjective intent can often only be shown by inferential evidence.").  The Hospital's perception of the work NPAS performed as an early-out servicer is consistent with that intent.  The record clearly indicates that NPAS did not subjectively intend to violate the FDCPA, and the first BFE prong is therefore satisfied.

"As to the second element of the defense" courts within the Sixth Circuit have "explained that a bona fide error is one that is made in good faith; inadvertently; without fraud or deceit." *Durthaler* at 494 (citing *Edwards v. McCormick*, 136 F.Supp.2d 795, 800 (S.D. Ohio 2001)). NPAS made very clear in its communications with Plaintiff on behalf of the Hospital that, "[a]s part of our ongoing effort *to control the costs of health care*, your account is being managed *by a centralized patient accounting business office located outside of our medical center.*  If you have questions regarding your account, please call *us* at the toll free number on the front of this letter." (Boyle Aff. Ex. G) (emphasis added.)  The record evidence in this case clearly demonstrates that NPAS never hid its relationship with the hospital or attempted to deceive Plaintiff in any way. The Agreement between NPAS and the Hospital also clearly demonstrates that if NPAS did somehow service a defaulted debt, it was the result of inadvertence – and in spite of its internal safeguards and customer contracts.  (Boyle Aff. Ex. F.)  The second BFE prong is therefore met.

The third element—the "reasonable procedures" prong—has two parts.  "The first step is to determine whether the debt collector maintained—*i.e.*, actually employed or implemented— procedures to avoid errors; and, second, whether the procedures were reasonably adapted to avoid the specific error at issue."  *Durthaler* at 494 (internal quotation marks omitted and citing *Johnson*, 443 F.3d at 729; *Jenkins v. Heintz*, 124 F.3d 824, 834-35 (7th Cir. 1997); *Frye v. Bowman*, 193 F.Supp.2d 1070, 1088-89 (S.D. Ind. 2002); *Taylor v. Luper, Sheriff, & Niedenthal Co., L.P.A.*, 74 F.Supp.2d 761, 766-67 (S.D. Ohio 1999)).  Here, any error would have been the servicing of an account that NPAS did not know was in default status, and which the Hospital inadvertently forwarded to NPAS to handle, in contradiction of the fundamental business model that is consistently employed by NPAS and the Agreement.  (i.e., not to service defaulted debts).

34

The primary procedure NPAS used to avoid such errors was to obtain contractual representations from its customers that they would never place defaulted accounts with NPAS for servicing.  That procedure was reasonable, and the case law supports it, because, as a general proposition, debt collectors, "within reasonable limits" are "entitled to rely on their client's statements" concerning the nature of a debt.  *Clark v. Capital Credit & Collection Serv.*, 460 F.3d 1162, 1174 (9th Cir. 2006) (citing *Bleich v. Revenue Maximization Group, Inc.*, 233 F.Supp.2d 496, 500-01 (E.D.N.Y. 2002); *Beattie v. D.M. Collection Collections, Inc.*, 754 F.Supp. 383, 392 (D. Del. 1991) ("Generally, a debt collector may reasonably rely upon information provided by a creditor who has provided accurate information in the past."); *see also Chaudry v. Gallerizzo*, 174 F.3d 394, 406 (4th Cir. 1999) (debt collector not required to "vouch for the validity of the underlying debt.")).  Here, NPAS reasonably relied on the Hospital's contractual representation that it would not place defaulted accounts for servicing, and thus the third prong of the BFE analysis is satisfied.

As discussed at length *supra*, NPAS maintains procedures to require that hospitals and clinics it serves do not place with it patient accounts that are in default status.  Indeed, its very contract with the Hospital expressly stated that it does not handle and will not service any defaulted accounts.  Moreover, the Hospital expressly promised not to forward to NPAS any accounts that were in default.  Consequently, any arguable attempt to collect on an account that actually may have been in default status was not intentional, would have been unknowing, and occurred notwithstanding the reasonable procedures that NPAS employed to avoid such occurrences.  NPAS accordingly should be shielded from liability by the BFE defense.

## CONCLUSION

Plaintiff has failed to assert any actionable FDCPA claims.  Moreover, she has failed to establish either Article III standing or materiality.  In addition, NPAS is protected from liability by the bona fide error defense.  As a result, NPAS respectfully asks the Court to dismiss Plaintiff's claims on the merits.

Dated:  October 17, 2016                      Respectfully submitted:

                                              MOSS & BARNETT
                                              s/ John P. Boyle
                                              John P. Boyle (MN Bar #186946)*
                                              150 South Fifth Street, Suite 1200
                                              Minneapolis, MN 55402
                                              Telephone: (612) 877-5253
                                              Fax:  (612) 877-5018
                                              E-Mail:  John.Boyle@lawmoss.com
                                              *Admitted *pro hac vice*

                                              CORS & BASSETT, LLC
                                              Kevin R. Feazell (#0059634)
                                              537 East Pete Rose Way, Suite 400
                                              Cincinnati, OH 45202-3578
                                              Telephone:  513-852-8200
                                              Fax:  513-852-8222
                                              E-Mail:  krf@corsbassett.com

                                              **Attorneys for Defendant NPAS, Inc.**

36

## CERTIFICATE OF SERVICE VIA ECF

The undersigned certifies that foregoing Memorandum in Support of Defendant's Motion

for Summary Judgment was served on the following parties, via electronic case filing, on

October 17, 2016, properly addressed as follows:

FOR PLAINTIFF:

Zachary L. Taylor, Esq.
9900 Corporate Campus Drive, Suite 3000
Louisville, KY 40223
ztaylor@taylorlawcenter.com

Nina B. Couch, Esq.
Couch Law, PLLC
2815 Taylorsville Road, Suite 101
Louisville, KY 40205
couchlawpllc@gmail.com

s/ John P. Boyle
John P. Boyle

3365901v2