UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

_____

ELLA J. FAUSZ, individually,
and on behalf of a class of similarly situated persons,

                                           CASE NO.:  3:15-cv-00145-CRS

        Plaintiffs,

   vs.

NPAS, Inc.,

        Defendant.

_____

## DEFENDANT'S REPLY BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

      Plaintiff's entire factual allegations against Defendant NPAS, Inc. ("NPAS") are

contained in a lone paragraph in her Responsive Memorandum.  (Doc. No. 56.)  Plaintiff alleges

that on January 27, 2014, Springfield Regional Medical Center (the "Hospital") placed her

account with NPAS.  (Pltf.'s Resp. Memo. at 4.)   She then alleges that on February 11, 2014,

NPAS sent her a letter (the "letter") on behalf of the Hospital.  (*Id*). She closes by alleging that

the letter failed to contain FDCPA notices and disclosures required of a "debt collector."  (*Id.)*

      Plaintiff ascribes to NPAS no knowledge of anything about Plaintiff's account other than

those allegations.  Plaintiff makes factual allegations concerning events occurring prior to

January 27, 2014, but those, in large part, are directed at the Hospital or other parties.  She makes

*no* allegation that NPAS had *any* knowledge of the actions undertaken by the Hospital or others.

      In its moving papers, NPAS offered substantial material facts, demonstrating that it never

knowingly collects defaulted or bad debt and that it operates only as an "early-out" extended

business office for hospitals and clinics.  NPAS provided abundant evidence showing that it serves merely as an off-site extension of the business offices for the medical providers it serves. It does no credit reporting.  It sends communications to patients in the name of the medical providers it serves.  Patient payments are made directly to the hospitals or clinics.  In short, NPAS operates almost exactly the same way as the "early-out" vendor in *Church v. Accretive Health, Inc.,* No. 14-CV-0057-WS-B, 2015 WL 7572338 (S.D. Ala. Nov. 24, 2015) aff'd at ___ Fed.App'x___, 2016 WL 3611543 (11th Cir. July 6, 2016), which the courts there found not to be a "debt collector" subject  to the FDCPA.

In response, Plaintiff offered no rebuttal to these facts.  Instead, she pointed to a single, isolated patient account – *hers* – and suggested that the unique facts surrounding *her* account, *and her account alone*, should form the basis for a class action lawsuit.  Critically, Plaintiff has failed to establish that NPAS is a "debt collector" subject to the FDCPA.  Accordingly, her claims must fail, and her Complaint should be dismissed.

## ARGUMENT

### I.  PLAINTIFF SUFFERED NO "CONCRETE" INJURY-IN-FACT AND CANNOT ESTABLISH ARTICLE III STANDING.

NPAS argued that Plaintiff has suffered no "concrete" injury-in-fact or "informational injury" sufficient to warrant Article III standing.  All that Plaintiff alleged in her Complaint was a bare procedural injury – which is simply not enough for her to go forward with her claims.

#### A.  Plaintiff Conceded That She Has Not Suffered A "Concrete" Injury.

In the context of Article III standing, a sufficiently concrete injury-in-fact can take any of several forms:  "tangible," "intangible," the creation of a "material risk of harm," or even "informational harm."  *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016); *FEC v. Akins*, 524 U.S.

2

11 (1998).  But there must be *some* type of injury-in-fact to support a plaintiff's Article III

standing, even in the context of an alleged statutory violation.  *Spokeo* at 1543.

Plaintiff has conceded that she is "not seeking damages" for herself, but instead, she is

fighting for the rights of others "to make sure that the law is followed."  *See* pp. 32:13-34:4 of

Transcript of Deposition of Ella J. Fausz ("Fausz Dep.") attached as Exhibit A to the Affidavit of

John P. Boyle ("Boyle Aff.").  Indeed, Plaintiff stipulated on the record that she is seeking *no*

actual damages.  (*Id.* at 52:21-22.)  She also admitted that her claim is based solely on the one

letter she received from NPAS, and nothing more.  (*Id.* at 8:21-9:2 and 27:17-20.)

These admissions defeat Plaintiff's claim that she has suffered a sufficiently concrete

injury to confer Article III standing upon her.  Moreover, Plaintiff's concessions are also fatal to

any arguments she may try to make that she possesses some kind of third-party standing to assert

the general rights of the putative class to ensure that "the law is followed."  *See Powers v. Ohio*,

499 U.S. 400, 411 (1991) (describing three predicates necessary for asserting third-party

standing, including that the litigant *herself* have suffered a concrete injury-in-fact).

**B.**     **Plaintiff Argues an "Informational Injury," But Has Not Established One.**

Plaintiff contends that a consumer suffers an injury-in-fact sufficient to confer Article III

standing by merely establishing "a debt collector's failure to provide the Section 1692g(a) and

1692e(11) disclosures."  (Pltf.'s Resp. Memo. at 11.)  Though Plaintiff does not use the phrase in

her opposition, she implicitly is inviting the Court to conclude that she has suffered an

"informational injury," or to find that she possesses "informational standing."   Plaintiff's

interpretation of the Supreme Court's holding in *Spokeo*, however -- concerning the nature of an

informational injury and standing -- falls well off the mark.  Moreover, Plaintiff failed to

demonstrate that she experienced such an injury.

3

### 1.     Informational injury and Article III standing.

*Spokeo* clarified that an injury need not be "tangible" to be "concrete."  *Spokeo* at 1549.

Indeed, according to *Spokeo*, an intangible injury, or even the "risk of real harm," may be

sufficiently concrete to confer Article III standing.  (*Id*.)  But, where, as here, a plaintiff alleges

deprivation of information to which she is statutorily entitled, the deprivation itself is not a

concrete injury – the deprivation must lead to the type of harm Congress intended to prevent.

The Supreme Court made this exact point in *Spokeo,* when citing to *Federal Election*

*Comm'n v. Akins*, 524 U.S. 11 (1998) and *Public Citizen v. Department of Justice*, 491 U.S. 440

(1989) for the proposition that "[j]ust as the common law permitted suit in such instances, the

violation of a procedural right granted by statute can be sufficient in some circumstances to

constitute injury in fact.  In other words, a plaintiff in such a case need not allege any *additional*

harm beyond the one Congress has identified."  *Spokeo* at 1549 (emphasis in original).

Importantly, however, neither the *Akins* court nor the *Public Citizen* court held that the

mere deprivation of information alone was sufficient to confer standing.  In *Akins*, the Supreme

Court held the plaintiffs' inability to obtain information regarding donor records, pursuant to the

Federal Election Campaign Act, prevented the plaintiffs from "evaluat[ing] candidates for public

office … [and] the role that [an organization's] financial assistance might play in a specific

election."  524 U.S. at 21.  In *Public Citizen*, the Supreme Court held the deprivation of

information prevented the plaintiffs from "seek[ing] access to the ABA Committee's meetings

and records in order to monitor its workings and participate more effectively in the judicial

selection process."  491 U.S. at 449.

Read together, *Spokeo*, *Akins*, and *Public Citizen* stand for the proposition that the

deprivation of information mandated by statute is sufficiently concrete to constitute an injury-in-

4

fact *if and only if* the deprivation leads to the type of harm the statute was intended to prevent.

This reading is consistent with the conclusion the D.C. Circuit recently reached in *Friends of*

*Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016).  Although the D.C. Circuit did not consider the

FDCPA or any other consumer-protection statute in *Jewell*, the court nonetheless examined the

concept of "informational standing."  The D.C. Circuit specifically explained that determining

whether a plaintiff has suffered an injury-in-fact, based on an alleged failure to disclose

information, is a two-part inquiry:

> A plaintiff suffers sufficiently concrete and particularized informational injury
> where the plaintiff alleges that: (1) it has been deprived of information that, on its
> interpretation, a statute requires the government or a third party to disclose to it,
> and (2) it suffers, by being denied access to that information, *the type of harm*
> *Congress sought to prevent by requiring disclosure*.

( *Id*. at 992) (emphasis added.)  As outlined below, Plaintiff cannot satisfy the second prong.

        **2.**      **The FDCPA requires debt collectors to provide certain information to**
                     **consumers, but Plaintiff has not suffered an injury of the type**
                     **Congress intended the FDCPA to prevent.**

The FDPCA requires "debt collectors" to provide certain information to consumers when

communicating with them.  In the initial contact, the "debt collector" must provide the consumer

with some basic information about the debt and specifically inform the consumer of her right to

dispute the debt, and how to do so.  *See* 15 U.S.C. § 1692g(a)(1)-(5).  The "debt collector" also

must disclose to the consumer in the initial communication that it is attempting to collect a debt

and that any information the "debt collector" obtains from the consumer will be used for that

purpose.  15 U.S.C. § 1692e(11).  The "debt collector" is further required, in all communications

with the consumer, to identify itself as a "debt collector."  (*Id*.)

NPAS does not dispute that if it were a "debt collector" (which it contends it is not), the

sending of the letter to Plaintiff likely would have satisfied the first prong of the informational-

injury inquiry.  However, Plaintiff has not pled nor produced any evidence to demonstrate that

she suffered any of the harms that § 1692g and § 1692e(11) are intended to prevent.

Generally, the purpose of the FDCPA is "to eliminate abusive debt collection practices by

debt collectors, to insure that those debt collectors who refrain from using abusive debt

collection practices are not competitively disadvantaged, and to promote consistent State action

to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).  "The statute seeks to

'protect consumers from a host of unfair, harassing, and deceptive debt collection practices.'"

*Jackson v. Abendroth v. Russell, P.C.*, ___F.Supp.3d___, 2016 WL 4942074, at *9 (D. Iowa Sep.

12, 2016) (quoting S. Rep. No. 95-382, at 1 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 1695).

Accordingly, the FDCPA, as a whole, creates in consumers "a substantive right to be free from

debt collector abuse, and the statute mandates various procedures to accomplish this goal and

decrease the risk of harm related to these practices."  *Perry v. Columbia Recovery Group, LLC*,

No. C16-0191JLR, 2016 WL 6094821, at *8 (W.D. Wash. Oct. 19, 2016) (citation omitted).

However, "this does not mean…violation [of that right] automatically amounts to the injury

identified by Congress in the statute." *Jackson*, 2016 WL 4942074, at *9.

Section 1692g of the FDCPA is specifically designed to "eliminate the recurring problem

of debt collectors dunning the wrong person or attempting to collect debts which the consumer

has already paid."  S. Rep. No. 95-382, at 4.  Subsection g(a)(1)-(5) provides the mechanism by

which this specific harm – dunning the wrong consumer or attempting to collect a debt already

paid – can be prevented.  Similarly, § 1692e(11) is designed to ensure that the consumer

appreciates that she is dealing with a debt collector and that the information she might provide

the debt collector may be used in furtherance of the debt collector's attempt to collect.

To have suffered a sufficiently concrete "informational injury," as a result of the alleged failure by NPAS to include a validation notice or a "mini-Miranda" warning in its letter, Plaintiff must demonstrate that she did not owe the debt; that she had already paid the debt; that she did not realize she was dealing with a debt collector; or that she provided information to NPAS that she would not have if she had realized she was dealing with a debt collector.  Plaintiff has not, and cannot, make any such showing in this case.

Plaintiff acknowledged under oath that when she received the letter from NPAS, she was fully cognizant that she owed the Hospital for the medical services she received.  (Fausz Dep. at 14:2-25.)  Further, Plaintiff testified that at the time she received the letter, she "assumed" that NPAS was a debt collector, because she had "already received notice from the hospital and…three other companies tried to collect a debt…for the bill [she] incurred" with the hospital. (*Id.* at 10:22-11:17); *see also Costa v. National Actional Financial Services*, 634 F.Supp.2d 1069, 1076 (E.D. Cal. 2007) (internal quotation marks, bracketing, and citation omitted) ("Although the purpose of the FDCPA requires a liberal construction of § 1692e(11) so as to protect the least sophisticated consumer, the purpose does not require patently unnecessary identification in subsequent communications when there are facts to suggest…that the consumer placed the call knowing who she was calling and understanding that she was speaking with a debt collector regarding debt collection.")  Plaintiff also testified that she cannot recall whether she ever contacted NPAS after receiving the letter.  (Fausz Dep. at 58:17-19, 60:8-15.) Moreover, Plaintiff makes no allegation that she provided any information to NPAS.

Plaintiff's allegation that the letter from NPAS did not include information required by the FDCPA satisfies only one element of her burden of proof.  Plaintiff has not, and cannot, establish that the absence of that information in the letter caused her any of the harms that

7

Congress intended to prevent in enacting the FDCPA, and specifically § 1692g and § 1692e(11). Plaintiff therefore has asserted a "bare procedural violation" of the FDCPA, "divorced from any concrete harm." *Spokeo*, 1549. Accordingly, she lacks Article III standing.

> **3.    Plaintiff's pleadings and testimony demonstrate that NPAS did not create a "material risk of harm" by omitting the § 1692g and § 1692e(11) disclosures from the letter.**

Article III standing also *may* exist where a plaintiff demonstrates the existence of a "material risk of harm." *Id.* Here, Plaintiff never intended to dispute the debt she owed the hospital – indeed, she admitted under oath that she owed the debt. Moreover, she has not pled nor shown that she ever intended to seek verification of the debt from NPAS. Consequently, the absence of the validation notice in the letter created no material risk of harm to Plaintiff. *See Jackson* at *6.; *Perry* at *6.

Similarly, Plaintiff testified that she "assumed" NPAS was a debt collector when NPAS communicated with her. Plaintiff has made no showing that she ever contacted NPAS, intended to contact NPAS, or provided any information to NPAS. Therefore, the absence of the "mini-Miranda" warning in the letter did not carry the risk of real harm to Plaintiff. (*Id.*)

## II.    PLAINTIFF FAILED TO ESTABLISH THAT AN "EARLY-OUT" VENDOR, LIKE NPAS, SHOULD BE SUBJECT TO THE FDCPA.

NPAS offered substantial material facts demonstrating that its fundamental business model is built on a commitment to never engage in the collection of defaulted accounts or bad debt. NPAS operates exclusively as an "early-out" service provider, and it only provides extended business office services to the hospitals and clinics it serves. NPAS does not knowingly handle any patient accounts that are in default or are considered bad debt by the medical providers it serves. Moreover, unlike "bad debt" collection agencies, NPAS does not do

any credit reporting.  Indeed, the commitment by NPAS to never conduct business as a "bad debt" collection agency, or to handle defaulted or delinquent accounts, is clearly embodied within the express terms of the written agreements it has with the health care providers it serves. In the instant case, the Hospital recognized that NPAS was an extended business office service vendor, serving as a partner in its health ministry, and was not a "bad debt" collection agency.

In response, Plaintiff did not rebut – nor even attempt to rebut – any of these material facts.  Plaintiff nevertheless insists that NPAS is a "debt collector" subject to the FDCPA.  In making this argument, she focuses exclusively on the unique factual circumstances surrounding *her* account with the Hospital.  She contends that NPAS should have included FDCPA disclosures and notices in the letter it sent her, because she believes her account with the Hospital was in default at the time.

Of course, Plaintiff's contention that her account was in default rests solely upon her own personal conclusion.  Even though Plaintiff took the depositions of two representatives of the Hospital and obtained an affidavit from another, she never asked anyone at the Hospital what the status of her account was when the Hospital transferred the account to NPAS.  Instead, Plaintiff inaccurately suggests that the affidavit she obtained from a Hospital representative indicates that the Plaintiff's account was deemed "uncollectible" at the time of placement with NPAS.  (Pltf.'s Resp. Memo. at 8.)  The Court can search the Hospital representative's affidavit far and wide (a copy is attached to Pltf.'s Resp. Memo. as Doc. 56-6) and find no such statement or conclusion.[1]

---

[1] Plaintiff also attached to her Responsive Memorandum as Exhibit Q (Doc. 56-16) several documents that she claims constitute the Hospital's "A/R Aging Schedule Entry" for Plaintiff's account.  She asserts that the exhibit shows that by December 21, 2012, the "Hospital recorded in its books that it expected $0 in estimated revenue on the debt."  (Pltf.'s Resp. Memo at 4.)  Yet, Plaintiff offers not a shred of foundation to establish who prepared the document or to show that the document is what she purports it be.  Moreover, she provides no information identifying when the document was prepared, for what purpose it was generated, or what impact it may have had on the Hospital's decision to place the account with NPAS for "early-out" services.

By focusing on *her* account alone, Plaintiff completely misses the mark.  As Plaintiff herself pointed out in her Memorandum, the FDCPA defines a debt collector as "any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  Excluded from the coverage of the FDCPA is any person who collects debt "which was not in default at the time it was obtained by such person."  (*Id.*)

NPAS has established, through undisputed material facts, that its principal business in no way is involved in the collection of debt that is in default.  The unrefuted evidence shows that NPAS serves only as an extended business office service provider for hospitals and clinics, and it never knowingly handles or accepts placement of defaulted accounts.  Likewise, NPAS does not in anyway, at any time, regularly collect or attempt to collect delinquent accounts or bad debt.

Plaintiff's silence in the face of these unrefuted facts is compelling.  All she could do in responding was point to the facts of *her* individual circumstances.  But she never argued nor provided any evidence establishing that her situation (even if her allegations are taken as true) was anything other than a "one off" event -- an anomaly -- something totally outside the norm.

The undisputed facts readily bear this point out.  Plaintiff's counsel asked a representative of NPAS under oath if he was aware of NPAS ever handling a patient account that was in default.  The representative testified as follows:

Q:      [ ] Why is it important for NPAS not to collect accounts that are in default?

A:      Because we only work early-out, nondelinquent, nondefaulted accounts that are not past due accounts.  So it's important that we adhere to the business associate agreement that we made with our clients.

****

10

Q:      If NPAS learns that an account is in default or past due or delinquent, what action would NPAS take regarding that account?

A:      If NPAS learns of something that's in default or delinquent, past due, then it would close and return per our contractual agreement with the client.

****

Q:      And how long have you worked for NPAS?

A:      It will be 19 years this November.

Q:      And you've worked in the collections department the entire time?

A:      Entire time.

Q:      And you're telling me that during that 19 years, you've never learned of an account that was in default after it was placed with NPAS?

A.      [ ] I know of no instance, not one instance where an account was considered to be in default, bad debt, or delinquent that was placed with our – placed with our office by our clients.  Not one instance.

See pp. 47:6-12, 57:22-58:3 and 59:18-60:7 of Transcript of Deposition of Timothy Steadmon

("Steadmon Dep.") attached as Ex. B to Boyle Aff.

Another NPAS representative, whom Plaintiff's counsel also questioned, similarly

testified as follows:

Q:      During the relevant time period, did NPAS ever have information that an account it was collecting for Springfield Hospital was in default?

A:      Not that I'm aware of.

****

Q:      Does NPAS ever turn away accounts because the accounts are in default?

A:      If they received an account they were aware was in default, they would not accept that account.

See pp. 84:3-7 and 86:22-87:1 of Transcript of Deposition of Lisa Summers ("Summers Aff.")

11

attached as Ex. C to Boyle Aff. [2]

Plaintiff's entire claim is premised on her belief that *her* account was in default when NPAS obtained it, and that as a result, NPAS is a "debt collector" subject to the FDCPA.  (Pltf.'s Resp. Memo. at 5.)  But such an insular, one-of-a-kind allegation is insufficient to prove that NPAS is a "debt collector" under the FDCPA for purposes of a purported class action lawsuit.

Indeed, Plaintiff's argument completely ignores the language of the FDCPA, which requires that to qualify as being a "debt collector," a business must regularly engage in collecting defaulted debt, or its principal purpose must be the collection of bad debt.  An isolated, one-time mistake by the Hospital in placing Plaintiff's allegedly-delinquent account with NPAS (even if that arguably happened) would not convert NPAS into a "debt collector" for purposes of the FDCPA.  To the contrary, the overwhelming facts demonstrate that NPAS follows a strict business practice of not engaging in the collection of delinquent or defaulted accounts.

With respect to the particular facts of Plaintiff's own unique situation, she offers no evidence to suggest that NPAS ever treated her account as though it were in default.  To the contrary, NPAS had zero history of ever handling defaulted accounts for a hospital or clinic.  It sent the letter to Plaintiff in the name of the Hospital, with a coupon attached to it for Plaintiff to make payment directly to the Hospital.  NPAS did no credit reporting on Plaintiff's account.  Moreover, the letter thanked Plaintiff for choosing the Hospital as her medical provider, and the letter advised her that in the interests of controlling medical costs, her account was being handled

---

[2] Plaintiff suggests in her Memorandum that this NPAS representative was uncertain about whether NPAS could be assigned defaulted accounts.  But the question posed was a hypothetical, as the following illustrates:

    Q:     If a client were to deem an account uncollectible, would NPAS still collect on that account?
    A:     The client is not supposed to place an account that they deem uncollectible with NPAS.
    Q:     It could happen, though?
    A:     I mean, I guess it could happen, but that's not the agreement we have with our clients….

(Summers Dep. at 34:9-18.)

by an off-site centralized patient accounting office.  There was simply nothing on the face of the letter to suggest to Plaintiff, or anyone, for that matter, that NPAS was treating her account as delinquent or that the letter was sent by a "bad debt" collector, which NPAS was not.

## III.   PLAINTIFF MADE NO SHOWING OF MATERIALITY.

As already noted, Plaintiff readily admits that she suffered no compensable injury as a result of anything that NPAS did.  When asked what kind of damages she was seeking for herself, Plaintiff responded, "I'm not seeking damages." (Fausz Dep. at 32:13-15.)  Instead, Plaintiff testified, "I just want to make sure the law is followed." (*Id.* at 33:25-34:4.)

NPAS argued that Plaintiff failed to make any showing that she relied in any material way on anything it communicated to her.  Indeed, Plaintiff has alleged no facts suggesting that NPAS communicated any information to her or anyone else that was in any way misleading or deceptive.  Her sole contention is that because she believes her account was in default when the Hospital assigned it to NPAS, the letter she received from NPAS should have contained FDCPA language.  But Plaintiff has failed to show that NPAS made any misrepresentation or otherwise did anything that had a material effect on her decision-making ability.

## IV.   PLAINTIFF FAILED TO REBUT THE REASONABLE ENTITLEMENT BY NPAS TO THE BONA FIDE ERROR DEFENSE.

It is undisputed that NPAS follows a core business model of serving only in the role of an extended business office for hospitals and clinics.  NPAS never knowingly handles any patient accounts that are in default or considered to be bad debt when the accounts are assigned to it for handling.  Indeed, the contracts used by NPAS, including the one between it and the Hospital, expressly prohibit medical providers from sending it accounts that are in default or delinquent.

For argument's sake, even if Plaintiff were to present facts sufficient to suggest that her account might have been in default, or was considered by the Hospital to be bad debt when the Hospital transferred the account to NPAS for servicing, NPAS has made a compelling showing that it should be shielded from liability based on the bona fide error defense. The transmission of this one account to NPAS by the Hospital would have been an inadvertent error or oversight by the Hospital, and NPAS would have had no way of knowing otherwise. As one of the NPAS representatives questioned by Plaintiff's counsel testified, there was nothing in the information transmitted to NPAS by the Hospital which would have suggested that the Hospital considered Plaintiff's account to be bad debt or uncollectible. (Summers Dep. at 84:3-85:2 and 92:1-11.)

The undisputed facts conclusively establish that NPAS did not knowingly service patient accounts that were in default or were considered bad debt when the accounts were placed with it. Plaintiff has not offered a shred of evidence demonstrating otherwise. Moreover, Plaintiff offered no evidence of lax standards or a cavalier approach by NPAS in its ongoing commitment never to handle defaulted accounts.[3] To the contrary, as one NPAS witness testified, in 19 years of working at NPAS, he did not know of a single incidence where NPAS had handled an account that was delinquent or in default. (Steadmon Dep. at 59:18-60:7.)

## V.   PLAINTIFF FAILS TO IDENTIFY ANY DISCOVERY SHE NEEDS BEFORE THE COURT CAN GRANT SUMMARY JUDGMENT.

Citing Fed. R. Civ. P. 56(d), Plaintiff insists she needs more time to complete discovery before the Court can rule on the Motion for Summary Judgment. The Rule upon which Plaintiff

---

[3] Plaintiff cites to *Alibrandi v. Financial Outsourcing Services, Inc.,* 333 F.3d 82, 88 (2nd Cir. 2003) for the proposition that NPAS cannot change the status of a debt by agreement. But NPAS is not attempting to change the nature of the debt. Instead, it is arguing that it reasonably and in good faith believed that Plaintiff's account was not in default when it serviced her account in 2014. The testimony of its representatives demonstrated that historically its contracts and procedures which were designed to avoid servicing defaulted debt worked successfully. Indeed, the NPAS representatives examined by Plaintiff's counsel repeatedly stated that NPAS did not service bad debt or defaulted accounts, and they were aware of no instances where it had. (Steadmon Dep. at 26:23-27:13; 29:5-13; 30:10-17; 36:7-17; 37:8-18; 47:6-16; 57:12-58:3; 59:5-60:7; Summers Dep. at 33:21-34:18; 38:15-17; 82:7-85:10.)

14

relies provides that "[i]f a nonmovant shows, *by affidavit or declaration, for specified reasons,* it cannot present facts essential to justify its opposition, the Court may [ ] allow time . . . to take discovery."  Fed. R. Civ. P. 56(d) (emphasis added.)

Plaintiff's request for more time is insufficient for two reasons.  First, Plaintiff failed to submit a "declaration" or "affidavit," as the Rule requires, supporting her request.  Second, Plaintiff failed to provide any "specified reasons," wherein she identified what discovery was still needed and why.  Indeed, Plaintiff did not describe how any additional discovery would provide probative facts that might affect the outcome of this Motion.  The best Plaintiff could do was to suggest that she still seeks information from the Hospital's accounting firm, pursuant to a subpoena duces tecum.  But her legal counsel issued that subpoena back on May 26, 2016. (Boyle Aff. Ex. D.)  Plaintiff provides the Court with no information of what it is that she allegedly still seeks from the accounting firm which might have any material effect on the outcome of this Motion.  Nor does she explain why she never did anything to enforce the subpoena or to raise the issue with the Court prior to the discovery and dispositive motion deadlines passing.

## CONCLUSION

Plaintiff has failed to establish that she had Article III standing, that NPAS is a debt collector, and that she has suffered any material harm.  She also offered nothing to explain why, given these undisputed facts, that NPAS should not be entitled to the protection of the bona fide error defense.  Accordingly, NPAS respectfully asks that Plaintiff's Complaint be dismissed with prejudice.

3397440v3

Dated:  November 28, 2016                     Respectfully submitted:

                                              MOSS & BARNETT
                                              s/ John P. Boyle
                                              John P. Boyle (MN Bar #186946)*
                                              150 South Fifth Street, Suite 1200
                                              Minneapolis, MN 55402
                                              Telephone: (612) 877-5253
                                              Fax:  (612) 877-5018
                                              E-Mail:  John.Boyle@lawmoss.com
                                              *Admitted *pro hac vice*

                                              CORS & BASSETT, LLC
                                              Kevin R. Feazell (#0059634)
                                              537 East Pete Rose Way, Suite 400
                                              Cincinnati, OH 45202-3578
                                              Telephone:  513-852-8200
                                              Fax:  513-852-8222
                                              E-Mail:  krf@corsbassett.com

                                              **Attorneys for Defendant NPAS, Inc.**

16

## <u>CERTIFICATE OF SERVICE VIA ECF</u>

The undersigned certifies that foregoing Defendant's Reply Brief in Support of Its Motion

for Summary Judgment was served on the following parties, via electronic case filing, on

November 28, 2016, properly addressed as follows:

FOR PLAINTIFF:

Zachary L. Taylor, Esq.
9900 Corporate Campus Drive, Suite 3000
Louisville, KY 40223
ztaylor@taylorlawcenter.com

Nina B. Couch, Esq.
Couch Law, PLLC
2815 Taylorsville Road, Suite 101
Louisville, KY 40205
couchlawpllc@gmail.com

s/ John P. Boyle
John P. Boyle

3397440v3