UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

ELLA J FAUSZ, individually, and on behalf of
a class of similarly situated other persons,                                            PLAINTIFF


v.                                                         CIVIL ACTION NO. 3:15-CV-00145-CRS


NPAS, INC.                                                                          DEFENDANT

## ORDER

This matter is before the Magistrate Judge to consider two related motions.  The motions

include a motion for a protective order filed by the Defendant[1] and a motion for sanctions filed

by the Plaintiff[2].  Taken together they represent the culmination of a longstanding discovery

dispute between the parties that began now over a year ago with a motion to compel filed by the

plaintiff, Ella Fausz.[3]

Fausz is the putative class representative of a potential class of similarly situated

individuals who seek to obtain statutory damages and injunctive relief against Defendant, NPAS,

Inc., a Tennessee corporation, for its alleged violation of the Fair Debt Collection Practices Act

(FDCPA), 15 U.S.C. § 1692,  *et seq*.  As noted in our prior order of January 5, 2016,

> Fausz alleges that NPAS violated the Act by its failure to include certain required
> information in its written communications to her and the other members of the
> putative class as required by 15 U.S.C. §1692g(a) and by its failure to disclose in
> the same written communications its status as a "debt collector" in violation of 15
> U.S.C. §1692e(11).

---

[1] (DN 47, Defendant's Motion for Protective Order)
[2] (DN 48, Plaintiffs' Motion for Sanctions)
[3] (DN 13, Motion to Compel)

The written communications at issue relate to the efforts of NPAS to collect delinquent medical debt from the Plaintiffs on behalf of the Springview[4] Regional Medical Center/Community Mercy Health Partners (Springview or Medical Center).  Fausz alleges that NPAS failed to include a "notice of debt" in its communication as required by 15 U.S.C. §1692g(a) and did not identify itself as a debt collector contrary to the requirements of 15 U.S.C. §1692e(11) when it contacted her on Feb. 11, 2014, seeking to collect a 2011 medical debt on behalf of Springview.

NPAS in its answer denies that it is a "debt collector" under the FDCPA so that the provisions of the Act do not apply to it.

(DN 19, Order Granting Motion to Compel, pp. 1-2).  It maintains instead that it acted merely as "an extended business office for the hospital" to contact its former patients regarding debts not declared in default, i.e., "bad debts," so as to be subject to the provisions of the FDCPA.  (DN 47, Memo p. 2).

Fausz originally served interrogatories and requests for production on NPAS 18-months ago on April 24, 2015.  Two months later, on June 24, 2015, NPAS served its responses, which contained objections to the relevancy of 7 interrogatories and 16 requests for production of documents, along with further objections to 5 interrogatories and 10 other document requests based on grounds of privacy, confidentiality or trade secret protection.  The parties then set out on an attempt to informally resolve their differences with respect to discovery.

Fausz through her counsel, wrote to counsel for NPAS on June 25, 2015, to identify alleged deficiencies in its discovery responses.  NPAS responded the following month on July 10, 2015, whereafter the parties reached agreement on October 5, 2015 on the provisions of a confidentiality agreement.  Counsel exchanged emails concerning their discovery dispute on October 20, 2015.  This exchange resulted in supplemental discovery responses by NPAS provided two days later on October 22.  Because Fausz continued to believe that the

---

[4] Fauz in her original motion to compel errantly referred to the hospital as the "Springview Regional Medical Center," contrary to her complaint, which correctly identified the proper entity as the "Springfield Regional Medical Center." Except for the quoted portion of the prior order, we use the latter designation throughout.

supplemented responses were deficient, she filed the aforementioned motion to compel (DN 13, Motion to Compel).  After NPAS filed its Response (DN 15, Response) and Fausz her Reply (DN 17, Reply), the Court addressed the parties ongoing dispute in an extended order entered on January 5, 2016 (DN 19, Order).

The Order of the Court, some 19-pages in length, addressed 9 categories of disputed discovery (DN, 19 Order pp. 3-19).  After setting forth the scope of discovery under Rule 26(b)(1), the Court examined the legislative history, purpose and requirements of the FDCPA. (DN 19, Order pp.  6-9). Based on the scope of Rule 26(b)(1) and the FDCPA, the Court concluded that Fausz was entitled to the majority of the requested discovery, with certain limitations.  The Court therefor ordered NPAS to provide its compliance procedures, policies, and manuals, which it concluded that Fausz was "fully entitled" to receive.  (DN 19, Order p. 10).

The Court also granted the motion to compel with respect to the identity of the compliance personnel of NPAS sought by interrogatory 12.  (Id. at p. 11).  It granted Fausz's motion to obtain the net income of NPAS under interrogatory 14, along with her interrogatories 13 and 15, which sought information concerning other FDCPA claims and lawsuits brought against NPAS within the past five years.  (DN 19, Order, pp. 12-13).  The Court ordered NPAS to produce information on its debt collection techniques and methods as sought by interrogatory 19.  (Id. at p. 13-14).  It further ordered NPAS to produce an unredacted copy of its contract with Springfield Regional Medical Center as sought by document requests 8, 17 and 26.  (Id. at p. 14).

The Court then proceeded to order NPAS to produce "a copy of any insurance agreement that might provide coverage to NPAS should be held liable for violation of the FDCPA."  (DN 19, Order pp. 14-15).  NPAS had argued in this regard that because it had not tendered the

defense of the suit to any insurance provider, Rule 26(a)(1)(iv), which requires production of "any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment . . . ," did not apply.  The Court rejected this argument.  The Court ordered NPAS to provide various debt collection performance reports, i.e., NPAS Champion Challenge Results Reports and Dashboard Reports, because it concluded they were relevant to the determination of the putative class and whether, at the time the accounts were obtained by NPAS, they were in default.  (Id. at pp. 15-16).

The final category of disputed discovery addressed by the January 5 Order centered upon document request 34 for the account records of the individual debtors in the putative class. Fausz sought to obtain these records to identify individuals who potentially would qualify for class membership and to determine the full extent to which NPAS allegedly had been noncompliant with the provisions of the FDCPA.  NPAS resisted the production of these account records solely on the ground that the Plaintiff had no need to know the names of other patient/consumers indebted to Springfield, or the status of their debts.  (Id. at p.16-17).  The Court ruled, once again, in favor of Fausz.

While noting that nothing prevents the "disclosure of the names and addresses of putative class members merely because class certification has not yet been obtained," the Court accepted the offer of Fausz "to have the account records of the putative class members produced with the names of the members redacted from the documents until such time as the District Court resolves the question of classification."  (DN 19, Order at pp. 18-19).  On this point, the Court specifically held that:

> With that final condition, the Magistrate Judge concludes that production of the account records is appropriate.  The privacy concerns raised by NPAS are fully taken into account by the confidentiality agreement and the **redaction of the individual account holders' names from the account records**.  Issues of

4

numerosity and typicality under Rule 23 are inevitable in the context of the present action given the Plaintiff's efforts to obtain class certification.  Indeed, NPAS in its response has already broached the argument that the potential claims of the putative class members are sufficiently individual that they cannot be the basis for a class action.  The Court therefore finds that the requested account records now sought by the Plaintiff in document request no. 34 are discoverable with the modifications suggested and accepted by the parties to redact the names of the various debtors found therein.  The motion to compel accordingly is GRANTED to this extent.

(DN 19, Order p. 19)(emphasis added).  With that final ruling, the Court directed NPAS to

"supplement its discovery production to take into account the present rulings of the Court"

within 45 days of the date of entry of the Order.  (Id.).  No objections were filed by either party

to the Order.  The Court consequently presumed that the matter had been fully resolved.

Instead, what followed over the next several months was a series of motions, initially

filed jointly, to extend the deadlines for completion of discovery (DN 20, 26). On June 1, 2016

however, Fausz, filed her own separate motion for enlargement of time to complete discovery

(DN 34, Motion for Enlargement of Time).  In her motion, Fausz complained that "NPAS and

Mercy Health have been generally uncooperative in the discovery process."  (Id, p. 1). She

explained that, while NPAS had produced some responsive documents immediately prior to the

depositions of Timothy Stedman and Mercy Health, it had failed to provide "certain documents

and information that the Court ordered to be produced."  (Id. p. 2). Fausz alleged that NPAS had

failed to turn over its weekly inventory reports and that Mercy Health had not produced its

accounting policies, which had led counsel for Fausz to seek a status conference with the Court

on May 23, 2016 given the discovery deadline of June 1, 2016.  For these reasons, Fausz

requested that the court extend the discovery cutoff date, which the Court granted.  (Id.).

NPAS filed a response to address the five categories of documents that the Plaintiff was

seeking (DN 35, Response).  As to these categories, NPAS advised the Court that: (1) "there

exists no general liability insurance policy for NPAS to produce that affords any applicable insurance coverage;" (2) "NPAS has produced everything it has related to training and compliance materials addressing federal and state debt collection requirements;" (3) that it was unclear what additional data related to the account records that Plaintiff was seeking; (4) there were no written processes and policies in place between Springfield Regional Medical Center and NPAS except for the Extended Business Office Services Agreement, which had been produced; and (5) the Weekly Inventory Reports sought by the Plaintiff were the Medical Center's records not in NPAS's possession. (DN 35, Response pp. 4-5).

The Court in response to these developments conducted a telephonic status conference on June 6, 2016. (DN 36, Order). The Court followed the conference with an Order that directed NPAS to provide the general liability insurance policy held by its parent company, HCA. (Id.). It further ordered that counsel confer directly in an effort to informally resolve their dispute over the compliance procedures, policies and manuals of NPAS as well as the account records of the individuals in the putative class. (Id.). The Court set a further telephonic status conference for June 22, 2016 to gauge the progress made by the parties.

When the date for the conference arrived, the Court learned that counsel continued to have "disputes concerning the as yet unprovided data fields for the account records of the individual guarantors." (DN 39, Order p. 1). The Court instructed counsel to "directly discuss the cost and availability of producing the description code and account notes items, as well as the possible existence of any account data fields not identified to date." (Id.). The Court deferred its consideration of the request of the Plaintiff for production of those account data fields that identify the address of each of the individual guarantors "until such time as any motion of the Plaintiff for classification is fully resolved by the District Court." (Id at p. 2). The Court then

set yet another status conference for July 18, 2016 while it "strongly encouraged [counsel] to work cooperatively to resolve the remaining discovery disputes prior to the conference." (Id.). Unfortunately, it was not to be.

On July 15, 2016 Fausz and NPAS simultaneously filed separate status reports on their progress. (DN 40, 41 Status Reports). NPAS advised the court at that time that "four outstanding discovery issues . . . remained unresolved." (DN 44, p. 1). NPAS explained that:

> Three of those issues implicate concerns over the burden and expense that would be required for NPAS to produce data that Plaintiff seeks, prior to a decision on Plaintiff's Motion for Class Certification. In addition, data which Plaintiff seeks contains personal identifiers, which the Court has ruled NPAS has no obligation to produce at this time.

(Id.). Both parties advised the Court that each was in the process of preparing a discovery-related motion. In light of these developments, the Court advised the parties that the telephonic status conference would be canceled. (DN 46, Text Order). On August 12, 2016, NPAS filed its motion for protective order. (DN 47). Fausz filed her own motion for sanctions (DN 48). We turn now to the substance of each motion.

*Motion of NPAS for a Protective Order*

NPAS moves the court pursuant to Rule 26(c) to enter a protective order that stays its obligation to respond to the Plaintiff's request for production of documents. The first category of documents involves "description codes for archived patient accounts." (DN 47, p. 5). These are codes, according to NPAS, that "are displayed on the computer screen for each patient account and provide a concise historical summary of any activities that NPAS has undertaken on behalf of the Hospital for each patient account." (Id). NPAS contends that for it to now produce the archived description codes "would be neither simple nor inexpensive." (Id, p. 6). To do so,

7

apparently would cost $11,250 and take approximately 45 days during which NPAS will be forced to dedicate computer processing capacity to the project.

In the face of such burden, NPAS insists that the Plaintiff has failed to "suggest in any meaningful way why this information might be relevant, necessary, or even useful to the determination of class certification." (Id.).  According to NPAS, Fausz already has obtained "precisely the information she needs to seek certification of the class . . . she defined in her Complaint.  (Id.).  It therefore asks the Court to enter a protective order pursuant to Rule 26(c)(1)(B) that it "shall not be required to engage its engineers in this time-consuming endeavor before classification has been decided."  (Id, p. 7).

The second category of documents discussed in the Motion for Protective Order is "account notes for currently-active and archived patient accounts."  (Id, p. 8).  The account notes "reflect the chronology of activities that NPAS undertook in behalf of the Hospital with respect to each patient account."  (Id.).  The notes contain not only individual entries made by NPAS staff concerning the specific interactions with patient debtors, but also automatically recorded references to software generated activities.  (Id.).  NPAS argues that these account notes "frequently contain references to personal identities of Hospital patients" so that in order to properly produce the notes, in light of the Courts prior order in which it deferred ruling on the production of such personal identifiers, NPAS would have to individually review and redact from each of the account notes the personal identifiers for each affected patient included in the 40,000 total accounts involved.

NPAS estimates that such an undertaking would require approximately 6666 hours of labor at a cost of $133,320 based on an average hourly staff rate of $20 (Id, p. 9).  Because such efforts would place an undue burden on NPAS and its employees, as well as significant expense,

8

NPAS asked the Court to rule in its protective order that NPAS will not be required to produce the account notes for either the active or archived patient accounts until after the issue of class certification has been decided subject to reimbursement by the plaintiff for any expenses incurred in producing such notes. (Id., p. 10).

*A Rule 26(c)(1) Standard*

A party that seeks the issuance of a protective order pursuant to Rule 26(c) bears the burden to show good cause for the issuance of such an order. *In re Skelaxin Metaxalone Antitrust Lit.*, 292 F.R.D. 544, 549-50 (E.D. Tenn. 2013). *See also, Nix v. Sword*, 11 Fed.Appx. 498, 500 (6th Cir. May 24, 2011) ("The burden of establishing good cause for a protective order rests with the movant."). To show good cause, the moving party must articulate specific facts that show a clearly defined and serious injury resulting from the discovery sought; mere conclusory statements will not be sufficient. *In re Skelaxin*, 292 F.R.D. at 549. *See, Nemir v. Mitsubishi Motors Corp.,* 381 F.3d 540, 550 (6th Cir.2004) (explaining that the party seeking a Protective Order must describe the alleged harm it will suffer with "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements" (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16 (1981)). Rule 26(c) "assumes that a party has the right to issue a discovery request in the first place. *Id*.

Good cause will not be shown merely because the disputed discovery may be inconvenient or expensive. *Isaac v. Shell Oil Co.*, 83 F.R.D. 428, 431 (E.D. Mich. 1979) (citing *United States v. Amer. Opticor Co.* 39 F.R.D. 580 (N.D. Cal. 1966)). Good cause, however, may be shown where a party demonstrates that the disputed discovery requests seek irrelevant

information. *Abraham v. Trinity Health Corp.*, No. 12-14402, 2013 WL 2051160 at *1 (E.D.Mich. May 14, 2013).

As with most matters involving discovery, the District court is granted broad discretion to grant or deny protective orders under Rule 26. *Eagle v. Hurley Medical Center*, 292 F.R.D 466, 478 (E.D. Mich. 2013)(" This Rule confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."); *Proctor & Gamble Co. v. Banker's Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). Because entry of a protective order is contrary to the basic policy in favor of broad discovery, the party that seeks a protective order has a heavy burden to make a strong showing why discovery should be denied. *Cockrill v. Mortgage Electronic Registration System*, No. 3:13-0031, 2013 WL 1966304 at *3 (M.D. Tenn. May 10, 2013) (citing *Skellerup Industries, Ltd v. City of Los Angeles*, 163 F.R.D. 598, 600-01 (C.D.Cal. 1995)). Nevertheless, as a party's showing of the need for discovery diminishes, the harassment and oppression required to be shown to justify relief under Rule 26(c)(1)(B) diminishes in equal measure, as well. *Serrano v. Cintas Corp*, 699 F.3d 884, 901 (6th Cir. 2012)(quoting 8A Charles Alan Wright & Arthur R. Miller et al., <u>Federal Practice and Procedure</u> § 2036 (3d ed. 2012).("Thus even very slight inconvenience may be unreasonable if there is no occasion for the inquiry and it cannot benefit the party making it.").

We begin with the first category of documents addressed in the motion for a protective order—the description codes for the archived patient accounts. The Court must deny NPAS relief on this category for two reasons. The first reason is that the motion clearly is untimely. The Court addressed the issue of production of account records in its prior order of January 5, 2016 (DN 19, Order). Any objection that NPAS had concerning "purged," or archived, patient account records was required to be put before the Court either in response to the motion to

compel or by objection to the prior Order.  Instead, NPAS made no objection to the Order, and continued to routinely archive patient account records throughout the time that production of account records was to be made.

A Motion for a Protective Order filed some eight months after the ruling of the Court is undeniably untimely.  *Nestlé Foods Corp. v. Aetna Cas. and Sur.  Company*, 129 F RD 483, 486-87 (D. N.J. 1990 (motion for protective order filed after the due date for discovery was untimely so that even had the movant made a satisfactory showing of good cause the motion would have to be denied); *Ayers v. Continental Cas. Co*., 240 F.R.D. 216, 222 (N.D.W.V. 2007)(same); See 8 C. Wright & A. Miller, Federal Practice and Procedure § 2035, at 262 (requests for protective orders are required to be made in a "seasonable" manner).  Because NPAS did not timely raise this issue either in response to the motion to compel, or by objection to the January 5, 2016 Order, it cannot now, by way of the current motion, call into question the substance of the prior Order in this respect.

Further, given what has transpired, no undue burden is visited upon NPAS by requiring it to bear the $11,250 expense and 45 days of effort to acquire patient account records that it knowingly archived in the face of the Plaintiff's discovery requests, and continued to do so after the Order of this Court.  By its actions, NPAS consciously accepted the risk that it would be compelled to recover these electronic documents.  Accordingly, to require it to bear that expense now is not to place an undue burden on NPAS.  *See gen., John B. v. Goetz,* 879 F.Supp.2d 787, 877–78 (M.D.Tenn.2010) ( "[d]eleted information in a party's computer's backup tapes is as discoverable as electronic documents in current use") As for the relevance of the account records, the Court fully addressed that issue in its prior Order and will not revisit it again.  The

patient account records in their entirety except for the names and addresses of the patients are relevant and discoverable, including all populated data fields.

The second category of disputed discovery – – account notes for currently-active and archived patient accounts – – requires elaboration.  The Court initially ordered only the redaction of account holder names from the individual account records produced.  This was done to address certain privacy concerns expressed by NPAS (DN 19, Order p. 19).  NPAS had argued in response to the motion to compel that the identity of the patient account holders should not be revealed, and did not need to be revealed, in order for Fausz to pursue certification of her proposed class.  Fausz offered redaction of the names as compromise to assuage these concerns. The Court agreed and its original order was so limited.

As a result of the telephonic status conference of June 22, 2016, however, the Court enlarged the scope of its original Order to include a deferral of its consideration of Plaintiff's request for production of the addresses of the individual account holders, referred to as "guarantors," until such time as the District Court resolved the Plaintiff's motion for class certification.  (DN 39, order, p. 2)[5]  This modification remains in effect.  Nevertheless, the account notes are a legitimate part of the account records that the Court ordered to be produced without objection.  To achieve both ends – – production of the account records and protection of the privacy of the account holders – – the Court accepts the compromise offered by Fausz in her status report of July 15, 2016.  In her Status Report, Fausz explained that:

> There is an alternative solution.  NPAS maintain several types of account notes, including notes created by NPAS and those created by the Hospital.  In the NPAS-created notes, NPAS does not include personal identifiers.  For instance,

---

[5]  Specifically, the Court stated in its Order:

> 2. The Court defers its consideration of the Plaintiff's request for the production of the account data field that identifies the address of each of the individual guarantors until such time as any motion of the Plaintiff for class certification is fully resolved by the District Court.

(DN 39,p. 2).

>the NPAS notes refer to patients and guarantors by the abbreviations "PT" and "GN" respectively, and not by name.  Thus, production of the NPAS-created account notes would satisfy the discovery needs of Plaintiff while protecting the privacy interests of those individuals in the hospital-created notes.

(DN 41, Status Report, pp. 5-6).

The Court views this compromise as eminently reasonable.  It satisfies the needs of the Plaintiff and protects the privacy of the account holders in accordance with the original intent of the Court.  Accordingly, to the extent that NPAS refuses to produce this separate category of account notes, its request for a protective order is likewise denied.  NPAS shall be required to produce this subcategory of account notes for all accounts, both active and archived.  The same is true of the data field that identifies the state of residence of the account holders.  Apparently, a separate data field for such information exists within the account records, the disclosure of which would not in any fashion adversely affect the privacy of the account holders.  The Court therefore orders that this separate data field identifying the state of residence of the account holders/guarantors be produced, as well.  In keeping with the earlier portion of this Order, NPAS shall bear the full cost of such production.

*Motion for Sanctions*

The Court turns next to Plaintiff's motion for an award of sanctions pursuant to Rule 37(b) of the Federal Rules of Civil Procedure (DN 48).  Fausz argues in her motion that she is entitled to an award of sanctions due to the repeated, willful violations of this Court's prior Order of January 5, 2016 by NPAS over the past eight months (DN 19).  She explains that NPAS has violated the Order in three different respects

>First, NPAS purged and concealed relevant account records and withheld production of others. Second, it denied the existence of its liability insurance agreement throughout the discovery period. Third, it failed to produce its training

and compliance manuals within the discovery period, tendering these documents only after the discovery cutoff and only after it repeatedly denied the existence of such materials.

(DN 48, p. 1).  Consequently, Fausz now seeks an enlargement of the time period for discovery, a stay of proceedings until NPAS has complied with the January 5 Order, and finally, an award of attorney's fees and costs directly related to her efforts to enforce the Order in the face of NPAS' noncompliance.

Fausz insists that NPAS set out on a deliberate mission to withhold from production for as long as possible such critical items as: its insurance agreement; its complete debt collection compliance policies, procedures and manuals; and, its account records, thousands of which it "purged" [archived] even after the Court ordered the production of the records.  Not until after the close of discovery on June 1, 2016 did NPAS produce an insurance agreement, its complete debt collection compliance manual and the identification of the actual 1,188 data fields used in the account records database, while previously producing only 21 of these data fields without earlier disclosing the existence of the remaining 1167 such fields. Fausz contends that other portions of the unproduced data fields may well contain relevant information such as "adjustment codes, return reasons, account notes, credit scores, account statuses, credit reporting dates, and close code extensions" that NPAS has wrongfully denied her the opportunity to examine during the time for discovery.

 Fausz continues in her motion to provide several specific examples of NPAS' alleged deliberate noncompliance with unequivocal language of the prior Court Order.  As for the insurance policy, she maintains that NPAS initially stated that there was none, then subsequently stated that no policy existed that provided coverage for the claims raised, only to finally concede that a general liability policy through its parent company was believed to exist, but it did not

14

provide coverage.  Although counsel for NPAS agreed to tender this policy to Fausz by April 8, 2016, she explains that no such policy was produced until *after* the deposition of NPAS employee, Lisa Summers, on May 18, 2016 during which Summers advised that she believed that NPAS had insurance coverage through its parent, HCA (DN 48, Exhibit 2, Summers' Depo. P.  107).

Fausz explains that she originally requested in April 2015 complete copies of any NPAS policies, handbooks, manuals and employment training materials that related to compliance with federal and state debt collection laws.  After the Court ordered NPAS to produce such materials, it instead advised Fausz that it "does not possess any FDCPA compliance policies and procedures since its policy is not to collect on defaulted debt."  (DN 48, Exhibit 1, Suppl. Resp. No. 27).  Subsequently, during the deposition of Timothy Steadmon held on May 19, 2016, Fausz learned for the first time that NPAS did indeed have a training manual that, according to Steadmon, included such matters as "account handling processes, procedures, FDCPA, state restrictions, following proper HIPAA procedures, opening scripts, closing scripts."  (DN 48, Exhibit 3, Steadmon depo. P. 13).  Also identified by Steadmon during his deposition was an online reference tool used by NPAS employees to comply with collection laws.  ( Id at p. 12). Only after the close of discovery did NPAS on June 2, 2016, provide a mere 13-pages of what ultimately turned out to be 244-pages of training materials.  NPAS finally produced the entire 244-page debt collection compliance manual on June 17, 2016 in response to complaints of Plaintiff's counsel.

Based on the above events, Fausz now insists that the Court must award sanctions against NPAS due to its willful disobedience of the Order of January 5, 2016.  Pursuant to Rule 37(b)(2)(C), Fausz asked the Court to enlarge the discovery period, stay the proceedings until

NPAS fully complies with the January 5 Order, and admonish NPAS that further such noncompliance may result in more severe sanctions and award attorney's fees and expenses as authorized by the same Rule.  (DN 48, p. 7).

NPAS challenges every aspect of the sanctions motion.  First, it protests that the motion itself is inappropriate and, in effect, the result of misdirection by Fausz, whose counsel previously indicated only that Plaintiff would be filing a "motion relating to discovery," rather than one seeking sanctions based entirely on discovery-related matters that the parties had fully addressed in their prior status reports with the Court.  Second, NPAS insists that the motion is filled with "unseemly exaggeration and distortion" in a failed effort to create a basis for sanctions.  To support this view, NPAS discusses each of the categories of discovery addressed in the motion for sanctions to explain what actually occurred, as opposed to what Fausz alleges occurred.

For example, NPAS explains that it never denied that it is self-insured, or that no insurance policy exists that would provide coverage for Fausz's FDCPA claims.  Indeed, NPAS voluntarily revealed during a telephonic status conference the existence of the general liability insurance policy held by its parent company, HCA, a policy which does not provide coverage for such claims, and in addition, has a $5 million deductible that "makes it literally impossible for it to ever apply to this case," given that the most that could be awarded to the putative class under 15 U.S.C. § 1692k(a)(2)(B)(ii) is total damages in the amount of $500,000.  When ordered to produce the policy, NPAS did so, despite the undeniable fact that the policy not only does not provide coverage, but also contains a deductible that renders it inapplicable under any scenario. These circumstances, combined with the fact that the policy was not issued to NPAS, but rather to its parent, HCA, makes the entire matter "much ado about nothing" according to NPAS.  (DN

16

49, p. 7).  Fausz's current claim that she must now re-depose Summers and Steadmon also is

"without merit," according to NPAS  given that the provisions of the policy as a matter of law

speak for themselves (Id.).

NPAS also addresses its debt collection procedures and compliance training manual.

NPAS insists that it produced these materials in good faith in response to the Court's order of

June 6, 2016.  NPAS explains that it never "repeatedly denied the existence" of its training and

compliance manual, but only asserted truthfully that it did not have any such materials on which

it relied in order to comply with the FDCPA.  This assertion is entirely accurate according to

NPAS because as an extended business office for Springfield Regional Medical Center, NPAS

did not fall within the scope of the FDCPA.  Indeed, the 244-pages of materials produced

contains at most several brief, isolated references to the FDCPA, which in no fashion

substantively address the requirements of the Act according to NPAS.  Consequently, Fausz's

current view that she will need to further question NPAS's representatives about manual is

entirely unpersuasive, particularly given the absence of any concrete examples of what

information she would inquire about related to the manual, most of which involves such

unrelated topics as patient privacy, customer service, telephone protocol, data entry procedures,

HIPAA requirements and identity theft.

NPAS next takes direct issue with the claim that it has "purged and concealed relevant

account documents" or that it has "withheld production of others."  The term "purged" is merely

used as another means to indicate that a particular account has been electronically archived.  The

term itself is found in the off-the-shelf computer software used by NPAS, which preserves the

patient account records that are archived.  No records are destroyed or deleted, contrary to what

Fausz may now suggest.  Further, accounts are routinely moved from the active NPAS computer

17

system at regular intervals and archived due to the substantial number of such accounts, which number in the tens of millions according to NPAS, so that none of the affected files were archived in response to the Order of the Court   The files instead were merely archived as a part of the routine operation of the software used by NPAS in the ordinary course of its business.

   NPAS likewise denies that it has "concealed and failed to provide complete account records."  Rather, in response to Fausz's request for "records of accounts Defendant acquired or serviced for Springfield Regional Medical Center . . . from February 11, 2014 to the present" NPAS produced spreadsheets that contained 30 items of information for each patient account. These items included the account number, the type of notice letters sent to the affected patients, the dates on which such letters were sent, the payment and adjustment history for each account and the date that the accounts were opened and closed.

   Only recently, during the telephonic status conference of June 22, 2016, according to NPAS, did Fausz made inquiry concerning specific "data fields" or "data points" that can be populated by the software used by NPAS.  Counsel for the parties conferred thereafter at the direction of the Court.  NPAS repeatedly ask Fausz to explain more precisely what she had in mind when using the term "data field" or when she asked for "data descriptions" of data fields. NPAS ask Fausz if she was asking for "every conceivable data point that can be entered into the system (even mere clerical or incidental entries), or are you seeking specific categories of data that you think might be useful to your case."  (DN 49, Exhibit A, Boyle Affidavit).  Ultimately, on July 15, 2016, NPAS produced spreadsheets that listed the 1,188 patient account record data fields potentially available for such records in light of the software used by NPAS.  The mere existence of a potential data field or potential data point, according to NPAS, however, does not mean that a particular data field is itself populated with information in any given account

NPAS points out that Fausz in her motion for sanctions has identified a number of these data fields that she believes may be relevant, such as: "adjustment codes," "return reasons," "account notes," "credit scores," "account statuses," "credit reporting dates," and "close code extensions."  (DN 48, p. 4).  NPAS maintains that a number of these identified data fields either are nonexistent or simply are immaterial.  For example, NPAS insists that it has no data field designated "credit scores," but rather has a data field designated "external score," which NPAS explains is "a custom algorithm for NPAS [that] does not represent any industry-recognized credit score, such as a FICO score."  (DN 49,p. 13).

The fields, "account status" and "close code extensions" are immaterial according to NPAS.  This is so, advises NPAS, because the status of all of the affected accounts of the putative class members is "closed," and the label "close code extensions" applies only to those patients with Medicare coverage, or who are represented by counsel, which involves only 0.3% of all such closed accounts and therefore could "have no possible material bearing on Plaintiffs class claims."  (DN 49, p. 13).  Finally, as for the data fields "return reasons," "credit reporting dates," and "adjustment codes," NPAS explains that it does not use these data fields since it is not a debt collector and does not do credit reporting.  Thus, a fair and balanced examination of what actually occurred shows that NPAS attempted in good faith to learn precisely what the Plaintiff was seeking with respect to such "data fields" or "data points" and ultimately produced a listing of all available data fields that anyone who used similar off-the-shelf software could employ so that, once again, Fausz's claims are merely "much ado about nothing."  For this reason, NPAS asked the Court to award it its fees and reasonable expenses under Rule 37(a)(5)(B).

*Rule 37(b)(2)(A)*

Fausz's motion for sanctions is governed by the provisions of Rule 37(b)(2)(A).  Under the Rule, if a party fails to obey an order of court to provide discovery under Rule 37(a), the Court in which the action is pending may impose one or more of the sanctions enumerated in subsections (i) through (vii) of the Rule.  The sanctions include: dismissal; entry of a default judgment; institution of contempt proceedings; striking the offending party's pleadings; staying further proceedings until the order is obeyed or an order that directs certain matters be taken as established for the purposes of the action.  Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii).  As the United States Supreme Court has explained, "Rule 37(b)(2) sanctions must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of a detriment."  *Roadway Express Inc. v. Piper*, 447 US 752, 763-64 (1980) (quoting *National Hockey League v. Metro Hockey Club*, 427 US 639, 643 (1976)). *See gen., Societe international v. Rogers*, 357 U.S. 197, 210-211 (1958).

The District Court has wide discretion when imposing sanctions. *Kara Holding Corp v. Getty Petroleum Marketing, Inc*, No. 99 civ. 0275 (RWS), 2002 WL 1684365 at *2 (S.D. N.Y. July 24, 2002).  Strong sanctions, however, are to be imposed only for serious violations of court orders that are due to willfulness or bad faith on the part of the offending party.  *United States v. Reyes,* 307 F.3d 451, 457 (6th Cir. 2002)(discussing the 4 factors the District Court considers under Rule 3(b)(2) prior to dismissal); *New Pacific Overseas Group (USA) Inc. v. Excal  Int'l Dev. Corp*., Nos. 99Civ. 2436, 2000 Wl 97358 at *4 (S.D. N.Y. Jan 27, 2000); *Valley Engr's v. Electric Eng'g  Co.* 482 F.3d 1091, 1097 n. 16(9th Cir. 2007)(" The most critical factor to be considered in case-dispositive sanctions is whether "a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts.")

Such severe sanctions may be an abuse of discretion if the non-compliance of the offending party is "due to inability to comply, confusion or misunderstanding." *Advanced America Services, Inc. v. United States,* 32 Fed. Cl. 191, 194 (Fed. Cl.1994). Otherwise, imposition of sanctions is discretionary and will not be reversed absent abuse. *Savola v. Webster*, 644 F.2d 743, 745-46 (8th Cir. 1981). In determining what, if any, sanction is appropriate under the Rule, the Court must take into consideration how the absence of the unproduced evidence allegedly impaired the moving party's ability to establish its case. *Wilson v. Volkswagen of America, Inc*. 561 F.3d 494, 504-05 (4th Cir. 1977).

The Court has given serious consideration to the request of the Plaintiff for sanctions. Sanctions are not a matter to be taken lightly, and the Court does not do so. When circumstances reveal, however, the deliberate decision of a party to delay, or otherwise obstruct, the orderly progress of discovery in the face of an order of the Court that grants a well-founded motion to compel such as the Order of January 5, 2016, then proportionate, yet firm, remedial action must be taken. *See Phillips v. Cohen*, 400 F.3d 388, 401-02 (6th Cir. 2005) ("The choice of what sanctions to impose is vested in the court's discretion."); See gen., 8B Charles Allen Wright & Arthur R. Miller, et al., Federal Practice and Procedure: Civil § 2284 ( Supp. 2013) ("Rule 37 is flexible. The court is directed to make such orders as are "just" and is not limited in any case of disregard of the discovery rules or court orders under them to a stereotype response.")

Here, it appears that NPAS knowingly chose to construe the Court's Order in such a fashion as to thwart the efforts of the Plaintiff to obtain information and documents clearly relevant to her FDCPA claims. The prior Order of the Court made several things clear. First, the subject Order unequivocally provided that Fausz "is fully entitled to the compliance procedures, policies, and manuals of NPAS." (DN 19,p. 10). Likewise, the Court ordered the

production of "a copy of any insurance agreement that might provide coverage to NPAS should it be held liable for violation of the FDCPA."  (Id at p. 14).  Finally, the Court, most importantly, ordered the production of the patient account records, subject only to the limitation that any portion of such records that identify the individual account holders by name should be withheld from production.  Otherwise, the Court gave no indication whatsoever in its Order that NPAS could elect to produce only a highly limited number of populated data fields, or data points, in each of the account records while unilaterally withholding the remainder and without even making the Plaintiff aware of the undisclosed data fields or data points.

Instead of being forthcoming, NPAS repeatedly asked counsel for the Plaintiff to explain what undisclosed data fields and data points the Plaintiff desired to obtain – – a task made impossible until NPAS finally acknowledged the existence of some 1188 such data fields and disclose a list of them to the Plaintiff for her review.  Not until *after* the conclusion of discovery did Fausz receive these critical items, along with the undisclosed insurance policy and remaining portions of the compliance training manual.  Plaintiff has been forced to work diligently for more than eight months in an ongoing effort to obtain compliance with the unchallenged Order that granted her motion to compel.  All the while, NPAS continued to archive patient account records while well aware that Plaintiff was seeking to obtain those same electronic records.

This unfortunate scenario suggests to the Court that sanctions are required.  Its discovery production in the face of the Court's Order was both belated and incomplete.  Only by adopting a strained and overly narrow interpretation of the Order has NPAS been able to attempt to justify its disclosure practices in the present case.  The imposition of sanctions under the circumstances is fully warranted.  *See Bass v. Jostens, Inc*., 71 F.3d 237, 241 (6th Cir. 1995)(setting forth a 4-factor test for imposition of sanctions under the Rule). The court therefore concludes that:

22

(1) NPAS shall pay the reasonable and necessary costs and attorney fees incurred by Plaintiff in bringing the present motion for sanctions.  Within twenty days of the date of entry of the present order, Plaintiff shall file a bill of costs with the Court, along with any supporting documentation of fees and expenses incurred. NPAS shall have twenty days thereafter in which to file any objections;

(2)  Discovery shall be reopened for a period of 90 days from the date of entry of the present order to ensure the Plaintiff a full and fair opportunity to obtain complete discovery;

(3) During this time, NPAS shall bear the full cost of producing the archived account records to include all populated data fields or populated data points with the exception of those that are specifically designated to contain the name or street address of the account holder. NPAS shall likewise produce all populated data fields or data points for its active account records that were not previously produced with the same exception for those fields or points that contain the name or street address of the account holder;

(4) NPAS shall also produce for all archived or active account records the above-discussed, NPAS-created account notes using the "PT" or "GN" designations.

(5) NPAS shall bear the cost of re-deposition of any witness previously deposed by Fausz that she is required to examine again as a result of NPAS's deficient discovery production.

Appeal of the present order is governed by the terms and the time limitations of Rule 72(a).

Cc. counsel of record